M. PAULINE CASEY ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79142, 79143, 79181, 79182, 79953. Filed June 21, 1962.

*Laurence F. Casey, Esq.,* for the petitioners.
*Chapman H. Belew, Jr., Esq.,* for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 79142 | M. Pauline Casey | 1955 | $4,260.24 |
|  |  | 1956 | 10,131.28 |
| 79143 | Mary Pauline Casey and Northeastern Pennsylvania National Bank and Trust Company, Cotrustees U/W of A. J. Casey, Deceased | 1955 | 520.87 |
| 79181 | Estate of Mary Joan Casey, Deceased, Aloysius G. Casey, Administrator, and Aloysius G. Casey, Individually | 1955 | 2,707.55 |
|  |  | 1956 | 2,575.58 |
| 79182 | Eugene D. Casey and Margaret H. Casey | 1955 | 2,127.87 |
|  |  | 1956 | 2,087.93 |
| 79953 | Estate of Joseph G. Casey, Deceased, Helen Clark Casey, Executrix, and Northeastern Pennsylvania National Bank and Trust Company, Executor, and Helen Clark Casey | 1955 | 6,447.67 |
|  |  | 1956 | 768.77 |

Certain issues have been conceded by each of the parties, leaving for our decision the following:

(1) Determination of the adjusted bases of partners' interest in partnership real property.

(2) Determination of the bases to the partnership of its land.

(3) Determination of the useful life and estimated salvage value of a hotel.

---

[1] Proceedings of the following petitioners are consolidated herewith: Mary Pauline Casey and Northeastern Pennsylvania National Bank and Trust Company, Cotrustees U/W of A. J. Casey, Deceased, Docket No. 79143; Estate of Mary Joan Casey, Deceased, Aloysius G. Casey, Administrator, and Aloysius G. Casey, Individually, Docket No. 79181; Eugene D. Casey and Margaret H. Casey, Docket No. 79182; and Estate of Joseph G. Casey, Deceased, Helen Clark Casey, Executrix, and Northeastern Pennsylvania National Bank and Trust Company, Executor, and Helen Clark Casey, Docket No. 79953.

(4) Determination of whether some of the petitioners herein may retroactively change their method of computing depreciation on a hotel from the straight line method to a declining balance method.

The findings and opinion here filed supersede previous findings and opinion filed April 12, 1962, and withdrawn June 18, 1962.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

From 1892 through 1927, Andrew J. Casey and Patrick J. Casey (hereinafter referred to as A. J. and P. J., respectively) acquired various parcels of real property situated in Scranton, Pennsylvania, holding title thereto as tenants in common, each holding a 50-percent interest.

For the calendar years 1926 and 1927 and for the short taxable year ending March 16, 1928, A. J. and P. J. filed Federal partnership income tax returns (Form 1065).

A. J. died on March 16, 1928, devising his entire residuary estate to M. Pauline Casey and Scranton-Lackawanna Trust Company as trustees (petitioners in Docket No. 79143), for the sole benefit of M. Pauline Casey (petitioner in Docket No. 79142). Northeastern Pennsylvania National Bank and Trust Company is successor trustee by a merger with the Scranton-Lackawanna Trust Company. Federal partnership income tax returns were filed by P. J. and estate of A. J. for the short taxable year beginning March 17, 1928, and for the calendar years 1929 through 1933.

P. J. died on November 13, 1934, and by his will devised and bequeathed his entire residuary estate to trustees of whom Jerome P. Casey and Scranton-Lackawanna Trust Company were the surviving trustees during the taxable year 1955. Eugene D. Casey (petitioner in Docket No. 79182), Aloysius G. Casey (petitioner in Docket No. 79181), and Estate of Joseph G. Casey, Deceased, et al. (petitioner in Docket No. 79953), each held a one-eighth income and remainder interest in said trust. The will of P. J. provided for the termination of said trust upon the expiration of 21 years after his death, i.e., on November 13, 1955. Federal partnership income tax returns were filed by the trustees under the wills of A. J. and P. J. under the title "Estates of A. J. and P. J. Casey" for the calendar years 1934 through 1955.

Upon the deaths of A. J. and P. J., their respective partnership interests continued to be held by their respective trustees under their wills. The fair market value of one-half of the partnership assets and liabilities as of the date of each of the partners' deaths were as follows:

SCHEDULE A

| Real estate | Fair market value of one-half of assets and liabilities | |
| --- | --- | --- |
| | At death of A. J. | At death of P. J. |
| Hotel Casey | $390,718.75 | $273,224.50 |
| Service Building | 30,000.00 | 21,600.00 |
| 327 Lackawanna | 50,000.00 | 34,000.00 |
| 329 Lackawanna | 100,000.00 | 66,950.00 |
| 520 Lackawanna | 21,635.00 | 12,000.00 |
| 522 Lackawanna | 20,085.00 | 10,500.00 |
| 523 Lackawanna | | 18,500.00 |
| 112 Adams Avenue | 85,500.00 | 47,500.00 |
| 126 Adams Avenue | 22,500.00 | 10,000.00 |
| Carbon Street | 4,625.08 | 1,000.00 |
| Kressler Court | 3,155.00 | |
| Total real estate | 728,218.83 | 495,274.50 |
| Cash and notes receivable | 77,751.84 | 104,826.74 |
| Total assets | 805,970.67 | 600,101.24 |
| Liabilities | | 134,973.95 |
| Net interest | 805,970.67 | 465,127.29 |

The substituted bases of the partnership interests were $805,970.67 to the A. J. Trust and $600,101.24 to the P. J. Trust.

After the deaths of A. J. and P. J., no adjustments were made to the book values of the aforesaid real property by reason of their deaths, and the assets were continued at their historical costs less depreciation for the purpose of computing depreciation deductions.

In auditing the partnership's 1936 tax return, respondent reduced the basis for depreciation of partnership assets as of January 1, 1936, by $114,438.80, and reduced 1936 depreciation claimed by the partnership from $35,480 to $24,008.04, increasing partnership income by $11,471.96. Respondent computed the reduced basis for depreciation by (1) combining the fair market value of the original partners' interests in each property as of the dates of their respective deaths and (2) subtracting therefrom a reserve for depreciation sustained in respect of such interests from said dates up to January 1, 1936. Respondent also determined that the basis of the land should be calculated by combining the fair market value of the original partners' interests in each property as of the dates of their respective deaths rather than costs. This adjustment was founded upon respondent's determination that new partnerships were created upon the death of each partner, and that the basis of the assets to the partnership would be, therefore, the total of the fair market values of the assets contributed by each trust to form the new partnerships. (Respondent now concedes this determination to be in error and that the original partnership between A. J. and P. J. was never liquidated upon their deaths.)

By book entry dated December 31, 1950, the partnership wrote down its depreciable assets by $114,438.80 and charged each partner's

account with one-half this amount, $57,219.40, to reflect this adjustment. The book values of the land, however, were never so adjusted on the partnership books.

From March 16, 1928 through 1955, the partnership continued to exist between the A. J. Casey Trust (hereinafter referred to as the A. J. Trust) and the P. J. Casey Trust (hereinafter referred to as P. J. Trust). Each partner made capital contributions to the partnership aggregating at least $40,902.85.

On March 9, 1936, the balance due on a partnership note held by the First National Bank of Scranton was reduced from $100,000 to $75,000. In 1936, the executors of the estate of P. J. made a "payment on a joint note" to the same bank in the amount of $12,500. The 1936 ledger of the partnership does not indicate any loan or account payable by the partnership to the executors under the will of P. J. Said $12,500 payment to the bank was, in effect, a contribution by the P. J. Estate to the partnership.

During the years 1928 through 1954, the partners' share of partnership income and the subsequent distributions to the partners from such income is as follows:

|  | A. J. Trust | P. J. Trust |
| --- | --- | --- |
| Total income | $727,237.36 | $505,168.06 |
| Distributions from income | 721,492.26 | 500,070.65 |
| Balance | 5,745.10 | 5,097.41 |

During the years 1928 through 1954, the following charges were made to the partners' capital accounts:

SCHEDULE C

|  | A. J. | P. J. |
| --- | --- | --- |
| 1930—Writeoff of land sold | $498.13 |  |
| 1933—Demolition loss | 2,185.96 |  |
| 1934—Demolition loss | 7,966.88 |  |
| 1934—Reversal of loss |  | 1 $7,966.88 |
| 1934—Correction of distributions |  | 1 5,307.10 |
| 1937—Payment to trustee | 15,172.97 | 15,172.97 |
| 1939—Demolition loss | 502.00 | 502.00 |
| 1939—Loss on sale | 2,854.46 | 2,854.46 |
| 1941—Mrs. P. J. drawing | 12,002.07 | 12,002.07 |
| 1941—Return of capital—Brewing Co | 5,000.00 | 5,000.00 |
| 1942—Mrs. P. J. drawing | 10,695.07 | 10,695.07 |
| 1943—Mrs. P. J. drawing | 11,079.43 | 11,079.43 |
| 1944—Mrs. P. J. drawing | 9,912.84 | 9,912.84 |
| 1945—Loss on sale | 1,500.00 | 1,500.00 |
| 1946—Loss on sale | 19,670.09 | 19,670.09 |
| 1946—Sale and distribution | 11,875.00 | 11,875.00 |
| 1948—Excess withdrawals | 19,858.89 | 19,858.89 |
| 1948—Correction in net worth | 2 6,219.62 | 2 6,219.62 |
| 1949—Distribution | 12,232.88 | 12,232.88 |
| 1950—Depreciation adjustment | 2 57,219.40 | 2 57,219.40 |
| 1951—Drugstore written off | 2 1,533.47 | 2 1,533.47 |
| 1951—Distribution | 250.00 | 250.00 |
| 1953—Distribution | 250.00 | 250.00 |
| 1955—Excess withdrawals | 6,553.05 | 5,553.05 |
| Total book decrease | 215,032.21 | 216,655.22 |

1 The parties have stipulated that this item should have been charged to the capital account.
2 The parties have stipulated that this item was erroneously charged to the capital account.

In addition to the capital accounts, the partnership maintained undistributed income accounts for each partner.

The partners' undistributed income accounts had no balance as of December 31, 1938. During the years 1939 through 1943 the following losses and distributions in excess of current earnings were charged to said accounts:

SCHEDULE D

|  | A. J. | P. J. |
|---|---|---|
| 1939—Distribution | $312.80 | $237.29 |
| 1940—Loss | 4,496.73 | 4,496.73 |
| 1941—Loss | 1,206.16 | 1,206.15 |
| 1942—Loss | 2,249.51 | 2,249.51 |
| 1943—Distribution | 10,000.00 | 10,000.00 |
| Deficit as of Dec. 31, 1943 | 18,265.20 | 18,189.68 |

The balances in said accounts as of December 31, 1947, were $2,684.39 for the A. J. Trust and $2,759.93 for the P. J. Trust, while the balance as reported on the 1947 partnership income tax return was $22,618.82 for each partner.

On December 31, 1948, the following entries and explanation were made on the general journal of the partnership:

|  | DR | CR |
|---|---|---|
| 1. Estate of A. J. Casey real estate capital account | $19,858.89 |  |
| 8. Estate of P. J. Casey | 19,858.89 |  |
| 4. To distributive income Trustees Estate of A. J. Casey |  | $19,858.89 |
| 12. To distributive income Trustees Estate of P. J. Casey |  | 19,858.89 |

To adjust distributive income descrepancies that have been existent for a number of years due to payments made during loss years which had been charged to distributive income—should have been considered capital distributions.

| Balance of distributive income 1947 income per our report |  | 22,618.82 |
| Credit balance in undistributive income 12/31/47 per our balance sheet (per account of Estate of P. J. Casey as Estate of A. J. Casey was overpaid $75.54 in prior years) |  | 2,759.93 |
| Net capital adjustment |  | 19,858.89 |

(After above entry, the balance in the accounts will represent drawings against 1948 income.)

The purpose of the entries was to eliminate from the partnership books distributed income charges which reflected partnership losses, and distributions to the partners during loss years. No distribution of property or money was made in 1948 to either partner in connection with or as a result of said entries.

The totals of the losses and excess distributions erroneously charged to the undistributed income account were $18,265.20 and $18,189.68 for A. J. and P. J., respectively. The amount of the ultimate adjustment was $19,858.89 for each partner. The record does not disclose the reason for the discrepancy between these figures.

The parties have stipulated the correct losses sustained by the partnership to be as follows:

SCHEDULE E

|  | A. J. | P. J. |
|---|---|---|
| 1940 | $3,789.21 | $3,789.20 |
| 1941 | 1,171.78 | 1,171.78 |
| 1942 | 2,249.51 | 2,249.51 |

On or about June 5, 1955, the partners agreed to a termination of the partnership effective on or about November 13, 1955.

Distribution of a one-half interest in some of the partnership properties was made by the partnership on June 5, 1955, as the first of a series of distributions in complete liquidation of the partners' interests in the partnership.

At the termination of the partnership, the partnership held current assets as follows:

SCHEDULE F

| Cash | $90,230.52 |
|---|---|
| Accounts receivable | 7,000.00 |
| Leasehold expense | 4,225.84 |
| Deferred charges | 9,426.06 |
|  | 110,882.42 |
| Attributable to each partner | 55,441.21 |

The cash and accounts receivable were distributed equally to the partners, while the leasehold expense and deferred charges were closed out on the books as equal distributions to the partners.

At the termination of the partnership, the land distributed to the partners had a cost basis, and a basis computed by totaling the fair market values of one-half of the parcels as of A. J.'s and P. J.'s deaths (respondent's 1936 determination), as follows:

SCHEDULE G

| Land | Cost | Fair market values |
|---|---|---|
| Hotel Casey | $350,000.00 | $226,223 |
| Service Building | 14,292.95 | 7,698 |
| 327-329 Lackawanna | 220,000.00 | 221,210 |
| 523 Lackawanna | 150,800.50 | 87,900 |
| 112-126 Adams | 187,500.00 | 118,140 |

Upon the termination of the partnership, the partnership's liabilities totaled $318.149.20, one-half of which, $159,074.60, was assumed by each partner.

The capital accounts of the partners as of December 31, 1955, reflected the following liquidating distributions: A. J. Trust, $406,706.95; P. J. Trust, $407,706.95.

For the year 1955, the partnership reported earnings in the amount of $8,160.23 which was distributed equally to the partners in partial liquidation of the partnership. This amount was increased by $17,217.37 by respondent by the capitalization of previously deducted expenditures, such increase not being in issue here. (This figure does not include an increase of $22,309.03 due to disallowance of depreciation deductions, discussed *infra*.)

As of the end of 1955 the partnership books contained an account entitled "Excess withdrawals, year 1955" indicating the following deficits in the undistributed income account:

A. J. Trust_____ $6,553.05
P. J. Trust_____ 5,553.05

In the individual partner's Federal income tax return (Form 1041) for the year 1955 such amounts were deducted by each partner in determining their respective partnership basis. Each return had the explanation: "Withdrawal in excess of income, 1955."

All of the petitioners in this consolidated proceeding filed their Federal income tax returns for the years 1955 and 1956 with the district director of internal revenue, Scranton, Pennsylvania.

Respondent has determined (with subsequent concessions) the adjusted basis of the partnership interests which is applicable to the real property of the partnership, as of the time of liquidation, as follows:

SCHEDULE H

| | | A. J. Trust | | P. J. Trust |
|---|---|---|---|---|
| Substituted basis at death_____ | | $805,970.67 | | $600,101.24 |
| Additions to capital_____ | | 40,902.85 | | 40,902.85 |
| Balance_____ | | 846,873.52 | | 641,004.09 |
| Decrease in capital per books (see Schedule C)__ | | 215,082.21 | | 216,655.22 |
| Balance_____ | | 631,841.31 | | 424,348.87 |
| Add: | | | | |
| Amounts erroneously charged to capital: | | | | |
| 1948—correction, net worth_____ | $6,219.62 | | $6,219.62 | |
| 1950—depreciation_____ | 57,219.40 | | 57,219.40 | |
| 1951—drugstore adjustment_____ | 1,533.47 | 64,972.49 | 1,533.47 | 64,972.49 |
| Balance_____ | | 696,813.80 | | 489,321.36 |
| Add: | | | | |
| Additions to 1955 income_____ | 2,112.92 | | 2,112.91 | |
| Additions to 1955 income_____ | 6,495.77 | | 6,495.77 | |
| 1955 depreciation disallowed_____ | 11,154.51 | 19,763.20 | 11,154.52 | 19,763.20 |
| | | 716,577.00 | | 509,084.56 |
| Add: Share of liabilities 12/31/55_____ | 159,074.60 | | 159,074.60 | |
| Minus: Share of liabilities originally assumed upon transfer_____ | 0 | 159,074.60 | 134,973.95 | 24,100.65 |
| | | 875,651.60 | | 523,185.21 |
| Less: Current assets distributed_____ | | 55,441.21 | | 55,441.21 |
| Total basis applicable to real estate_____ | | 820,210.39 | | 477,744.00 |

Respondent has also determined that the properties which were distributed by the partnership upon liquidation had a basis to the partnership as follows:

SCHEDULE I

| Asset | Land | Depreciable assets |
|-------|------|--------------------|
| Hotel Casey | $350,000.00 | $529,076.71 |
| Service Building | 14,292.95 | |
| 523 Lackawanna | ·150,800.50 | |
| 327-329 Lackawanna | 220,000.00 | |
| 112-126 Adams | 187,500.00 | |
| Machinery and equipment | | 1,831.80 |
| | | 4,322.22 |
| Carpeting | | 12,027.93 |

The basis of the depreciable assets was computed by using the basis as determined by respondent in 1936, minus depreciation allowed or allowable through 1955, while the basis of land was cost.

One of the properties owned by the partnership was the Hotel Casey. This was a 10-story basement structural steel, brick, and stone building in good physical condition in 1955, containing 309 sleeping rooms (215 having an attached private bath), a main dining room, grill lounge, air-conditioned coffeeshop and cocktail lounge on the first floor, and a ballroom and private dining rooms on the second floor. The roof is of tar and gravel pitched to interior drains which connect to storm sewers. All construction is of fire-resisting material and it is well maintained.

The hotel was constructed in 1910 and opened for business in January 1911, a substantial addition being built in 1915.

In the audit of the partnership's 1936 return, the estimated composite remaining life of the hotel as of January 1, 1936, was increased from 14⅓ years to 20 years, i.e., to expire on January 1, 1956. No reduction of the depreciable basis was made by respondent for estimated salvage value.

In 1948, approximately $200,000 was expended in permanent improvements on the hotel. In auditing the partnership's 1948 return, respondent fixed the composite remaining useful life of the hotel and equipment at 16½ years from July 1, 1948, i.e., to expire on January 1, 1965. Again, no reduction was made to the basis for estimated salvage value.

During the years 1949 through 1955, improvements were made to the hotel as follows:

Schedule J

| | |
|---|---:|
| Floor coverings | $11, 189. 03 |
| Furniture, linen, and window coverings | 21, 314. 82 |
| Storm windows and screens | 8, 075. 59 |
| Kitchen equipment | 39, 495. 59 |
| Roof sign | 9, 256. 75 |
| Air conditioning | 18, 362. 38 |
| Building alterations | 206, 269. 19 |
| Plumbing and electrical work | 132, 372. 88 |
| Total | 446, 336. 23 |

The greater portion of the above total, $405,122.02, was expended between 1949 and 1951. The agent's report concerning the 1948 extension of the hotel's useful life was dated April 10, 1951. There is no evidence concerning whether such post-1948 improvements were considered in making the 1948 determination.

The hotel was leased by the partnership to the Hotel Casey Company during the taxable years involved under a 10-year lease beginning January 1, 1952, at a fixed annual rental of $76,500, plus a percentage of the lessee's gross operating profits.

The lease required the lessee to keep the premises in good repair at all times and at the expiration of the lease to deliver the premises "in as good condition as at the commencement thereof, together with all improvements, ordinary wear and tear and unavoidable damages by fire, tempest and lightning excepted."

In addition to the aforementioned improvements, the Hotel Casey Company, lessee of the hotel, expended $169,563.18 in 1956 and 1957 for air conditioning, refurbishing the main dining room, and the installation of a new boiler.

The stock of the lessee, Hotel Casey Company, was held in equal shares by the A. J. Trust and by an inter vivos trust created by the widow of P. J. for the benefit of her eight children, three of whom are petitioners here.

The profit or loss of the owners and the lessees of the hotel during the years 1952 through 1959, is as follows:

Schedule K

| Year | Owners | Lessees |
|---|---:|---:|
| 1952 | $56, 847. 58 | $39, 563. 63 |
| 1953 | 52, 400. 77 | 34, 615. 33 |
| 1954 | 10, 250. 97 | 22, 276. 19 |
| 1955 | 8, 538. 02 | 21, 191. 98 |
| 1956 | (39, 149. 64) | 19, 391. 71 |
| 1957 | 24, 531. 91 | 6, 742. 65 |
| 1958 | (31, 198. 26) | (27, 375. 79) |
| 1959 | (31, 386. 27) | (2, 579. 98) |

The above figures take into account the depreciation as claimed by the owners on their income tax returns which was in accordance with respondent's 1948 determination of useful life.

During the years 1952 through 1959, the number of guests and the number of rooms sold of the Hotel Casey were as follows:

| Year | Guests | Rooms sold | Year | Guests | Rooms sold |
|------|--------|-----------|------|--------|-----------|
| 1952 | 93,249 | 75,552 | 1956 | 72,272 | 59,220 |
| 1953 | 92,837 | 76,431 | 1957 | 68,291 | 56,236 |
| 1954 | 81,425 | 67,473 | 1958 | 62,703 | 51,624 |
| 1955 | 77,141 | 63,487 | 1959 | 56,204 | 47,517 |

The occupancy of the hotel declined from 66 percent in 1952 to 56 percent in 1955.

On January 1, 1955, the basis to the partnership of the Hotel Casey was $912,364.43, $350,000 attributable to the land, and $562,364.43 to the depreciable assets.

On June 20, 1955, Roger Smith Hotels wrote a letter to the partnership which states, in part, as follows:

Gentlemen:

We are interested in purchasing the land and building known as the Hotel Casey, together with the hotel furniture, furnishings, fixtures and equipment, in the name of a new corporation to be formed for the purpose, on the following basis:

| | | |
|---|---|---|
| Purchase Price | | $1,600,000.00 |
| Payment to be made by: | | |
| Cash | $250,000.00 | |
| Assumption by the new corporation of the outstanding first mortgage held by the Jefferson Standard Life Insurance Company now approximating | 250,000.00 | |
| And the balance by the new corporation executing a purchase money mortage in the amount of | 1,100,000.00 | |
| | | 1,600,000.00 |

\*        \*        \*        \*        \*        \*        \*

Our obligation to purchase shall be conditioned upon \* \* \* (6) our purchase of the Casey Garage.

Concurrently, Roger Smith Hotels, as a part of and as a condition to the above proposal, sent a letter to the P. J. Casey Trust offering to purchase the Casey Garage which was, in turn, conditioned upon the purchase of the Hotel Casey.

On July 12, 1955, the partnership wrote the Roger Smith Hotels, in part, as follows:

ESTATES OF A. J. AND P. J. CASEY
SCRANTON 3, PA.

*July 12, 1955*

Mr. O. A. deLima, President
*Roger Smith Hotels*
*151 E. 50th Street*
*New York, New York*
      Subject: *Hotel Casey, Scranton, Pennsylvania*
Dear Sir:

    We have given serious consideration to the contents of your letter under date of June 20th, concerning the possible sale of the above property.

    First we wish to advise you that since your inspection of the Hotel Casey additional capital funds have been expended by way of improving the facilities of the hotel in the nature of the installation of additional showers which are used by the occupants of rooms without bath and also the laying of a substantial amount of new carpet. With this thought in mind the trustees of the two estates feel that your offer for the purchase of the hotel should be increased to the amount of $1,650,000.00.

    We feel that the cash payment as set out in your letter is insufficient and are of the opinion that this should be increased to an amount of at least $400,000.00.

    The trustees of the Estate of P. J. Casey feel that the injection of the possible sale of the Casey Garage property may be a confusing factor in connection with the possible sale of the Hotel Casey property itself. Accordingly, the offer of sale of the Garage is withdrawn from this particular transaction.

    We should like to have you give the above your serious consideration. If it meets with your approval then we would be glad to recommend its acceptance to the heirs of both estates.

The P. J. Trust declined to consider any sale of the Casey Garage property in connection with a possible sale of the Hotel Casey. No sale was ever effected to the Roger Smith Hotels.

Substantial changes occurred in the transient hotel industry during the years 1946 through 1956 causing hotels comparable in size to the Hotel Casey and located in cities comparable in size to Scranton to encounter financial difficulties. Construction of motels in such period resulted in a decline of room occupancy and dollar volume of business for such hotels. Hotel Casey depended a great deal upon the patronage of the old-fashioned traveling salesman, the drummer type, many of whom have turned to motels. Motels have been built in the Scranton area continuously since the end of World War II, some very close to the city itself. There are also few traveling salesmen because of changes in business organization, including the replacement of individual stores by supermarket chains and discount houses. The decline of occupancy of the hotel was due also to changes in travel patterns. Increased use of airplanes by salesmen has discontinued the need for them to remain overnight. In addition, express highways were built near Scranton during the period, but they bypassed the cities. The hotel's restaurant and bar patronage has also been adversely affected by the closing of Scranton movie theaters with the advent of home television.

In its 1955 return (Form 1065), the partnership computed and deducted depreciation on the hotel by reference to the 16½ years remaining useful life from July 1, 1948, as previously determined by respondent, or a 10-year life from January 1, 1955, without reduction of the basis for salvage value. Respondent, in his statutory notice, determined the remaining useful life of the hotel to be 15 years from January 1, 1955, i.e., to expire on January 1, 1970, and reduced the depreciable basis by 10 percent, representing estimated salvage value.

At the end of 1955 when the partnership was liquidated, the Hotel Casey was distributed to the A. J. Trust and to the remaindermen of the P. J. Trust as tenants in common, resulting in an undivided one-half interest to the A. J. Trust and an undivided one-half interest to the remaindermen of the P. J. Trust.

Although the complexion of the ownership of the hotel changed from the partnership in 1955 to a tenants in common arrangement in 1956, there was no change in the business of leasing the hotel. Nor was there any change in the method of accounting, including the computation of depreciation by the owners. The records of the new owners were maintained in the identical form as the old, and depreciation computation during the years 1956 through 1959 continued to be based upon the straight line method. For the year 1956, the individual tenants in common deducted their proportionate share of the depreciation on the hotel based upon the straight line method as did the partnership in prior years in determining net income. The deduction was based upon an assumed useful life from January 1, 1956, of 10 years with no reduction for estimated salvage value. Petitioners, by amended petition, claim a useful life of 9 years from January 1, 1956.

Respondent determined the useful life of the hotel as of January 1, 1956, to be 14 years.

The remaining useful life of the Hotel Casey as of January 1, 1955, was 10 years, and as of January 1, 1956, was 9 years.

OPINION.

I. *Basis of Partnership Interests.*

The Code of 1954 provides, insofar as is material here, the following method for determining the basis of a partnership interest:

SEC. 705. DETERMINATION OF BASIS OF PARTNER'S INTEREST.

(a) GENERAL RULE.—The adjusted basis of a partner's interest in a partnership shall, * * * be the basis of such interest determined under section 722 (relating to contributions to a partnership) * * *

(1) increased by the sum of his distributive share for the taxable year and prior taxable years of—

(A) taxable income of the partnership as determined under section 703(a).

\*     \*     \*     \*     \*     \*     \*

(2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of—

(A) losses of the partnership, and

The parties have stipulated the partnership's income and losses and distributions of current income each year from 1928 through 1954. The main difficulty in determining the basis of the partnership interest centers around the amount of distributions made in excess of current income. This is due to the fact that the partnership maintained both partnership capital and undistributed income accounts; that only net amounts of income over distributions were credited to these accounts, and that many erroneous entries were made charging the undistributed income accounts for losses and distributions in excess of earnings. Respondent has, therefore, relied upon entries to this account to help re-create the correct distributions. The disputed adjustments to the partner's bases are as follows:

### (a) 1948 Adjusting Entry.

In 1948 the partnership increased the undistributed income accounts of each partner and reduced each partner's capital account in the amount of $19,858.89. The parties agree that the entry did not reflect any distribution made in 1948. The reason for the entry was "to adjust distributive income discrepancies that had been existent for a number of years due to payments made during loss years which had been charged to distributive income and should have been considered capital distributions."

Respondent contends that since such amounts were "capital distributions" they should be deducted in determining each of the partner's basis under section 705(a)(2) and section 733(1).[2]

The record discloses that the undistributed income accounts of the partners did not contain any balances as of December 31, 1938. During the years 1939 through 1943, losses and distributions in excess of earnings in the total amounts of $18,265.20 and $18,189.68 for the A. J. Trust and P. J. Trust, respectively, were charged to each of the

---

[2] SEC. 733. BASIS OF DISTRIBUTEE PARTNER'S INTEREST.

In the case of a distribution by a partnership to a partner other than in liquidation of a partner's interest, the adjusted basis to such partner of his interest in the partnership shall be reduced (but not below zero) by—

(1) the amount of any money distributed to such partner, and

(2) the amount of the basis to such partner of distributed property other than money, as determined under section 732.

[All Code sections refer to the 1954 Code unless otherwise stated.]

partner's undistributed income accounts, leaving deficit balances in those amounts in the accounts as of December 31, 1943. (See Schedule D, *supra*.) The entire income for the years 1944 through 1947 was currently distributed to the partners. In 1948 the partnership determined that certain losses and excess distributions, which were previously charged to the undistributed income accounts, should have been charged instead to the capital accounts. The partnership then adjusted the books accordingly, transferring the amount of $19,858.89 from each partner's capital account to their undistributed income accounts. The record fails, however, to disclose the reason for the discrepancy between the figures; at the same time, petitioners do not maintain that the totals were erroneously calculated. We must assume, therefore, that there were other excess distributions which were not recorded on the books, which, when added to the known losses and distributions before us, would equal the amounts of the adjustments.

Insofar as the total amount of the adjustment was made up of excess distributions, such total must be deducted in determining each partner's basis. As to the losses, however, the parties have stipulated that the actual losses for the years 1940 and 1941 were $741.90 less for each partner than the amounts originally charged to the undistributed income accounts. Since the higher loss figures were used, undoubtedly, to determine the amount of the adjustments, such decrease in losses should be deducted from the total adjustment, leaving a total deduction from basis for each partner in the amount of $19,116.99, attributable to the losses and distributions.

While petitioners do not contend that these losses and distributions, as evidenced from the adjusting entry, did not occur, nor that such items are not valid deductions in determining basis, they maintain that they were offset by earnings in the years 1944 through 1947. They also maintain, inconsistently, or possibly alternatively, that such items were deducted elsewhere by respondent.

As to petitioners' first contention, in the light of the stipulation that all profits for 1944 through 1947 were currently distributed, we fail to see how they could have been used to offset prior losses and excess distributions. Nor can we find these items deducted elsewhere in respondent's determination. All of the deductions for losses and excess distributions made by respondent (see Schedule H, *supra*) were taken directly from the charges to the capital accounts on the books of the partnership. (See Schedule C, *supra*.) A review of these charges fails to disclose any charges for losses for the years 1940 through 1942, or any charges for distributions for 1939. Petitioners allege that the $10,000 distributions in 1943 included in determining the 1948 adjusting entry (see Schedule D, *supra*) were already deducted by respondent. The capital accounts of the partners were

charged in 1943 with an $11,079.43 distribution to each partner and this amount was deducted by respondent. (See Schedule C, *supra.*) In the absence of any evidence to the contrary, however, we may not assume that the same distributions would have been deducted from both the capital and the undistributed income accounts of the partners. We, therefore, must conclude that the entries represented different distributions and that both distributions must be deducted in determining basis.

*(b) 1955 Excess Withdrawals.*

The net income of the partnership as originally reported on its return for 1955 was $8,160.23, or $4,080.12 for each partner. The parties subsequently agreed upon an upward adjustment for 1955 income for each partner in the amount of $8,608.69, thereby creating a total income for 1955 for each partner of $12,688.81. The undistributed income accounts as of the end of 1955 (before the agreed adjustments were made) contained a deficit balance of $6,553.05 for the A. J. Trust, and $5,553.05 for the P. J. Trust, due to excess withdrawals. Such amounts were deducted by each partner in determining their respective capital accounts in their 1955 returns.

The parties agree that, under section 705(a), all income in 1955 should be added to the basis of the partners, all income distributions not in liquidation of the partnership should be deducted, and all income distributions in liquidation of the partnership are disregarded in determining total basis. All money distributions in liquidation, however, are deducted in determining the basis of real property transferred under section 732(b).[3]

Respondent has increased the basis of each partner to the extent of the agreed income adjustment for 1955, but has not increased them by the amount of the originally reported income, $4,080.12, for each partner. In addition, respondent has reduced each partner's basis by the amount of the deficit present in their respective undistributed income accounts as of the end of 1955.

There can be no doubt that under section 705(a)(1)(A) one-half of the partnership income for 1955 must be added to each partner's basis. The reason given by respondent for failing to do so was that "the agent may have treated it as a wash, that is, he did not increase petitioners' adjusted basis by the partnership's $8,160.23 reported taxable income and he did not reverse the credit to cash, showing that amount distributed." While respondent's method would have no effect upon determining the basis of the real property distributed, it would have

---

[3] SEC. 732. BASIS OF DISTRIBUTED PROPERTY OTHER THAN MONEY.

(b) DISTRIBUTIONS IN LIQUIDATION.—The basis of property, (other than money) distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.

an effect upon determining the total basis of the partnership interest, since distributions in liquidation are not considered here. While the amount of $4,080.12 should be added to each partner's basis, such amount must also be added to the total of money distributed in liquidation of the partnership. (See Schedules F and H, *supra.*)

We are faced with some difficulty concerning the deficit balances in the undistributed income accounts as of the end of 1955. Petitioners contend that these deficits were created by distributions made in 1955 in liquidation of the partnership, and, therefore, are disregarded under section 705(a). Respondent contends that these deficits were created by excess distributions in prior years and erroneously debited to these accounts and that they, therefore, must be deducted from basis.

The record is totally barren of any evidence supporting either of the parties' contention. There is no evidence as to the balance of the undistributed income accounts as of the end of 1954, nor the total amounts actually distributed in 1955. In the absence of such evidence we cannot say that respondent erred in his determination that such deficits should be deducted from each partner's basis. The presumption of correctness of respondent's determination is strengthened by the fact that the partnership had a history of charging excess distributions to these accounts. Also, we are unimpressed with petitioners' argument that the subsequent upward income adjustments in 1955 income would have wiped out the deficit in the undistributed income accounts for 1955. If the deficits represented distributions in 1955 in liquidation of the partnership (a fact we cannot find), such amounts could not be deducted under section 705(a) regardless of the amount of 1955 income. On the other hand, if the deficits were created by distributions in prior years, the 1955 increase in income could not be used to offset the distributions. The increase in income for 1955 is already added in full to each partner's basis. (See Schedule H, *supra.*) To allow excessive distributions in prior years to be offset also by this income, obviously, would be allowing a double addition for the same income.

### (c) *Adjustment Due to Liabilities Assumed by Partners Upon Liquidation.*

Section 752(a) provides:

(a) INCREASE IN PARTNER'S LIABILITIES.—Any *increase* in a partner's share of the liabilities of a partnership, or any *increase* in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership. [Emphasis supplied.]

Upon the liquidation of the partnership, each partner assumed liabilities in the amount of $159,074.60, representing one-half of the

total partnership liabilities of $318,149.20. The issue before us here concerns the amount of such liabilities which must be added to each partner's basis under section 752(a).

Inasmuch as there were no partnership liabilities outstanding at the time of A. J.'s death (and there were, therefore, none assumed by the A. J. Trust upon the transfer of the partnership interest to it), the parties agree that the full amount of the A. J. Trust's share of the liabilities assumed upon liquidation should be added to its basis. (See Schedule H, *supra.*)

In the case of the P. J. Trust, however, respondent has added only $24,100.65 of the assumed liabilities to such partner's basis, subtracting therefrom $134,973.95, representing one-half of the partnership liabilities at the time of P. J. Casey's death, which were assumed by that trust upon the transfer of the partnership interest to it.

Respondent maintains that the "increase" in the P. J. Trust's share of liabilities is the difference between the amount it originally assumed upon transfer of the partnership interest to it and its share of the partnership's liabilities assumed at the time of liquidation, and that only this difference may be added under section 752(a).

Petitioners, on the other hand, maintain that the entire share of liabilities must be added to the final adjusted basis, irrespective of any other liabilities assumed.

Petitioners' major premise is that the liabilities assumed upon entering the partnership are not taken into consideration in determining the original basis. Therefore, they conclude such liabilities should be disregarded and have no effect in determining the final adjusted basis. In essence, they argue that since they do not receive any "credit" for those liabilities in determining the original basis, they should receive full "credit" for all liabilities assumed upon liquidation.

It is obvious, and petitioners do not contend otherwise, that if the liabilities assumed by the P. J. Trust upon entering the partnership are used to increase its original basis, then, to the extent such amount of liabilities is still outstanding at the end of the partnership, an addition of that amount to its basis a second time would create a double addition for the same amount of liabilities assumed.

The question, thus, narrows down to whether the liabilities assumed by the P. J. Trust are taken into account in determining its initial basis. The starting point is section 705(a) which states: "The adjusted basis of a partner's interest in a partnership shall * * * be the basis of such interest determined under * * * section 742 [4] * * *."

---

[4] SEC. 742. BASIS OF TRANSFEREE PARTNER'S INTEREST.

The basis of an interest in a partnership acquired other than by contribution shall be determined under part II of subchapter O (sec. 1011 and following).

The regulations under this section provide, in part, as follows:

Sec. 1.742.1   Basis of transferee partner's interest.

\*       \*       \*       \*       \*       \*       \*

\* \* \* The basis of a partnership interest acquired from a decedent is the fair market value of the *interest* at the date of his death \* \* \*, *increased by his estate's or other successor's share of partnership liabilities, if any, on that date,* \* \* \* [Emphasis supplied.]

Under the regulations it is readily seen that the liabilities assumed upon entering the partnership are, in fact, taken into consideration by increasing the basis by such amount. The fair market value of P. J.'s interest in the partnership was $465,127.29 (in this case, the fair market value of one-half of the assets minus one-half of the liabilities. See Schedule A, *supra*). Such interest is then increased by the amount of liabilities assumed, $134,973.95, resulting in a total basis of $600,101.24.

While petitioners agree that the regulation method takes into account the originally assumed liabilities, they maintain that it is invalid as contrary to section 1014 and *Crane* v. *Commissioner*, 331 U.S. 1 (1947).

Section 742, while not specifically providing for the basis of a partnership interest transferred by devise or descent, directs us to section 1014(a). This section provides, in part, that—

the basis of *property* in the hands of a person acquiring the *property* from a decedent or to whom the *property* passed from a decedent shall, \* \* \* be the fair market value of the *property* at the date of the decedent's death, \* \* \*. [Emphasis supplied.]

In the *Crane* case, it was held that in determining basis the value of an asset is not affected by a mortgage or liabilities, and that the value of "property" refers to the value of the asset rather than the value of the equity interest in the asset.

Petitioners argue, in effect, that the "property" the P. J. Trust received was a one-half interest in all of the partnership properties, $600,101.24, and that the value of such "property" is not adjusted by any liabilities assumed by the trustee. We cannot agree. The "property" acquired by the trustee was not the ownership of any part of the assets owned by the partnership, but was an undivided *interest* in the partnership. *Henry W. Healy*, 18 B.T.A. 27, 33 (1929). Section 1014(a) applies to the value of this partnership *interest* rather than the properties owned by the partnership. *First National Bank of Mobile* v. *Commissioner*, 183 F. 2d 172–173 (C.A. 5, 1950), affirming 12 T.C. 694 (1949) (concerning section 113(a)(5), I.R.C. 1939, predecessor of section 1014, I.R.C. 1954).

While partnership liabilities are necessarily taken into consideration in determining the value of partnership *interest*, the resultant is

the "property" interest, and it is this "property" with respect to which the *Crane* case prohibits adjustments because of liabilities. No such adjustments were made here.

Under section 1014(a), therefore, the basis to the P. J. Trust would be the fair market value of the partnership interest, or $465,127.30. This amount would be increased under section 752(a) by the amount of liabilities assumed of $134,973.95, arriving at a total basis of $600,101.24. Income Tax Regulations section 1.742–1, providing for both steps in one section, is entirely consistent with the two Code provisions.

There is no specific Code provision particularly directed to determining the basis of a partnership interest received upon the death of a partner. Section 742, in the case of an interest received by devise or descent, merely directs us to the general basis section 1014. That Congress intended section 1014, when used in determining partnership basis, should be interpreted as we have done here can be seen from the Senate Finance Committee report concerning section 742, which states, in part, as follows:

For example, the basis of * * * an interest transferred upon the death of a partner will be the fair market value of the *interest* at death or the optional valuation date. [Emphasis supplied.]

S. Rept. No. 1622, 83d Cong., 2d Sess., p. 397.

We conclude, therefore, that inasmuch as the amount of $134,973.95 is added in determining the original basis of the P. J. Trust, only the increase in the amount of liabilities assumed by the trust over the years, $24,100.65, may be added now to basis under section 752(a).

We do not believe that Income Tax Regulations section 1.705–1(a)(4) forces a contrary result. That regulation, provides, in part, as follows:

For the effect of liabilities in determining the amount of contributions made by a partner to a partnership * * *, see section 752 and § 1.752–1, relating to the treatment of certain liabilities. In determining the basis of a partnership interest on the effective date of subchapter K, chapter 1 of the Code, or any of the sections thereof, the partner's share of partnership liabilities on that date shall be included.

The regulation does not state, as petitioners contend, that the liabilities on that date should be automatically added to basis. It merely states that such liabilities should be "included" in the basis. We have seen that the liabilities outstanding as of the end of 1955, $159,074.60, have already been included in the basis; $134,973.95 of this amount is included in determining the original basis of the trustees, and the balance of $24,100.65 is included as of the end of 1955. The regulation should not be interpreted as allowing the same amount of liabilities to be added twice.

### (d) Undistributed Income.

Section 705(a) provides, in effect, that the excess of a partner's share of all partnership income over all distributions to such partner should be added in determining the partner's basis, or the excess of all distributions to such partner over his total share of the partnership income should be deducted in determining the partner's basis, as the situation may arise.

The parties have stipulated the total amount of income attributable to each partner during the years 1928 through 1954. Only the total distributions to each partner is in issue.

The record discloses the distributions to each partner which were charged to the partners' capital accounts. The parties agree that such distributions be deducted in determining each partner's basis.

This issue concerns the total distributions which were charged to the undistributed income accounts. Regardless of the fact that the partnership made distributions which were charged to the capital accounts, and that such distributions were deducted in determining basis, if the total of the distributions to each partner which were charged to the undistributed income accounts was *less* than the total income attributable to each partner, such excess of income over distributions must be added in determining each partner's basis. On the other hand, if the distributions to each partner which were charged to the undistributed income account exceeded income attributable to each partner, such excess must be deducted in determining each partner's basis.

As of the time of liquidation, the undistributed income accounts contained deficit balances. Inasmuch as this clearly showed that distributions which were charged to the undistributed income account exceeded income by the amounts of the deficits, such deficits were deducted, *supra*, in determining basis.

Respondent did not determine that there was any excess of income over distributions and no amounts were added to basis by him because of "undistributed" income.

Petitioners contend on brief that income in the amounts of $5,745.10 and $5,097.42 were not distributed to the A. J. and P. J. Trusts, respectively, "but were retained in the partnership." Therefore, petitioner concludes, such respective amounts must be added to the partners' bases. The burden rests with petitioners to prove such contention.

The only support for this contention is an inconclusive stipulation which shows the yearly income earned by the partnership and the subsequent distributions which the partnership made from such income. All of the income according to the stipulation was currently distributed, except that income for the years 1934, 1935, 1936, 1948,

and 1949 exceeded all subsequent *distributions from such income* in the total amounts of $5,745.10 and $5,097.42 for the A. J. and P. J. Trusts, respectively.

As stated above, we must determine the *total* amount of distributions which were charged to the undistributed income account in order to balance this amount against known income. Ordinarily, this amount would be the same as the stipulated "distributions from income." The record discloses, however, that the partnership had a practice of charging undistributed income accounts with distributions when there was insufficient income in the accounts to cover it, thus creating deficit balances. Indeed, such accounts contained deficit balances as of the time of liquidation. The stipulation fails to disclose the total amounts of distributions charged to the accounts and shows only "distributions from income." While the stipulation tells us that income for some years was not subsequently "distributed," the record shows us a deficit balance in the undistributed income accounts, a situation which would not occur had such income been retained. The only explanation for this situation which we can reasonably draw is that, while the stipulation shows that some income was not distributed *after* it was earned (and, therefore, not included in the stipulated "distributions from income"), such income must have been distributed *before* it was earned. In other words, such "undistributed" income must have been used to offset prior deficits in the undistributed income accounts (created by distributions when there was insufficient income) which were anxiously waiting for such income to "cover" them. The "undistributed" income could not have been "distributed" thereafter (and was not included, therefore, in the stipulated "income distributions") because such income had already been offset by prior distributions and incapable of producing credit balances in the undistributed income accounts.

We need not conjecture further concerning how such stipulated "undistributed" income was treated or "used." Petitioners have failed to prove that there was an excess of income over *total distributions charged to the undistributed income account* and that any partnership income was retained in any form until the time of liquidation. They are not entitled, therefore, to have any amounts added to bases because of such factor.

Petitioners argue that any presumption of correctness attached to respondent's determinations vanished since certain items have been proved or conceded to be inaccurate. We cannot agree. It has long been recognized that where error has been shown by the taxpayer which does not affect the entire deficiency, but only a separable part thereof, the presumption of correctness remains with respect to the other items composing the deficiency, and petitioner still bears the

burden of proof of error with respect to such other items. *Hoffman* v. *Commissioner*, 298 F. 2d 784 (C.A. 3, 1962), affirming on this point a Memorandum Opinion of this Court. We find that petitioners have failed to meet the burden of proof or to demonstrate that the respondent's determination was arbitrary in these respects.

### (e) *1936 Capital Contributions.*

Section 705(a) provides that all contributions to a partnership must be added in determining a partner's basis. Petitioners contend that each partner paid $12,500 on behalf of the partnership in 1936, and that their respective bases should be increased, therefore, in such amounts.

We do know that on March 9, 1936, the balance due on a partnership note with a bank was reduced from $100,000 to $75,000 by a $25,000 payment. In addition, respondent concedes that the P. J. Trust made a $12,500 "payment on a joint note" to the same bank in 1936. Respondent, nevertheless, contends that there is no evidence connecting such payment with the liability reduction.

While the evidence is meager, we think it circumstantially establishes that the payment of $12,500 made to the bank by the estate was made on behalf of the partnership and in reduction of its note. Exhibit 17–Q (first and partial account of executors u/w Patrick J. Casey, deceased) attached to and made a part of the stipulation of facts largely supports this view although the language used, especially if taken out of context, is somewhat vague. Since the 1936 ledger of the partnership does not indicate any loan or account payable by the partnership to the executors under the will of P. J., we conclude that the $12,500 payment was a contribution to the partnership.

A similar claim of a $12,500 contribution is made with respect to the A. J. Trust. There is no evidence in the record to support it, however. Petitioners merely contend that "the inference is compelling that the remaining $12,500 paid on the loan in 1936 was paid for the account of the A. J. Trust."

No accounting for the A. J. Trust for 1936 was offered in evidence similar to that for the P. J. Trust which is embodied in Exhibit 17–Q. Since there is no supporting evidence, and since we may not rely on conjecture, however earnestly pressed, we must hold, with respect to the claim of a $12,500 contribution by the A. J. Trust, that petitioners have failed to sustain their burden of proof.

### II. *Allocation of Bases to Distributed Property.*

Once the bases of the individual partners in the partnership are established, such bases must be allocated to the individual properties distributed to them in order to determine the basis of each distributed

property for purposes of gain or loss on sale or computing depreciation. Section 732(c) (2) provides, in part, as follows:

(c) ALLOCATION OF BASIS.—The basis of distributed properties * * * shall be allocated—

*      *      *      *      *      *      *

(2) to the * * * distributed properties *in proportion to their adjusted bases to the partnership.* [Emphasis supplied.]

The parties are not in dispute concerning the bases of the depreciable property to the partnership except insofar as it relates to the 1955 depreciation of the Hotel Casey, discussed *infra*, and such bases are not in issue here. The parties also agree that the amount of the 1936 write down in depreciable assets charged to the partner's capital accounts, $57,219.40, was erroneous and that such amounts should be added back to each partner's basis. The sole dispute centers around the basis to the partnership of its land. Respondent has determined that the basis of the land is its respective historical costs to the partnership.

The law is well settled, and the parties agree, that the original basis to a partnership of its assets is not affected by the transfer of a partnership interest or death of a partner, although the basis of the transferred interest is thereby affected.

In *Robert E. Ford*, 6 T.C. 499 (1946), we stated (p. 502):

Since there was no dissolution or termination of the partnership in fact or by operation of law, we conclude that with respect to those securities sold by the partnership the original cost basis to the partnership of such securities is the proper cost basis for determining gain or loss to the partnership and the individual partners, * * *

Petitioners, while not contending that the original partnership between A. J. and P. J. was ever liquidated, thereby causing a change in bases, maintain that historical costs as a basis for land was rejected by respondent in 1936, and that he should be estopped from changing his determination now. They maintain, in accordance with respondent's 1936 determination, that the basis of land should be the totals of the fair market value of each parcel as of the dates of each original partner's death. While it is true respondent has conceded his prior determination to be in error and has changed his determination concerning the land, we fail to see how it has affected petitioners in any way. The record discloses that the partnership had never acquiesced in respondent's 1936 write down of land, and that their books were never changed to reflect the adjustment. We are at a loss to ascertain how respondent's change in position concerning land has damaged petitioners, and petitioners have not contended that any adverse effect resulted from the prior determination as to land. The doctrine of election and estoppel must be applied with great caution to the Gov-

ernment and its officials. We can see no basis here for holding respondent to an erroneous determination in the light of the fact that there is no proof or allegation of any adverse effect when such determination was originally made, or that petitioners have ever acted in reliance of it. We conclude, therefore, that the proper basis of the land to the partnership is the historical cost, and respondent's prior erroneous determination to the contrary does not estop him from making a correct determination at this time.

### III. *Depreciation of Hotel Casey.*

Respondent has redetermined for the third time the composite useful life of the Hotel Casey and its furniture and equipment. He had last determined that such useful life was 17 years from January 1, 1948, i.e., to expire on January 1, 1965, with no estimated salvage value at that time to be deducted from the depreciable base. Respondent now determined that the useful life as of January 1, 1955, and January 1, 1956, was 15 and 14 years, respectively, thus extending the useful life 5 years, to expire on January 1, 1970. The total useful life of the hotel would be, therefore, 59 years. He has also determined that 10 percent of the basis should be deducted as of January 1, 1955, to allow for estimated salvage in 1970. Petitioners maintain that respondent's prior determination is correct, that the useful life was 10 years from January 1, 1955, and that there would be no salvage value at that time.

Inasmuch as salvage value is not a factor in determining useful life, we shall discuss each determination separately.

Income Tax Regulations section 1.167(a)-1 (b) provides, in part, as follows:

Sec. 1.167(a)-1  Depreciation in general.

(b) *Useful life.*  For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economical changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of

computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * *

Respondent's determination is presumptively correct, and the burden rests with petitioners to prove that respondent's determination of useful life and salvage values is erroneous. Such proof should consist of facts known or reasonably anticipated at the end of the year for which depreciation is taken. *Max Isenbergh*, 31 T.C. 1046 (1959). The fact that a revenue agent's report for earlier years accepted the amount of depreciation claimed on the basis of the rates used in the taxable year is not binding on the respondent nor upon us. *Automatic Cigarette Sales Corp.*, 234 F. 2d 825 (C.A. 4, 1956), affirming a Memorandum Opinion of this Court.

The Supreme Court of the United States has stated that the useful life of an asset is "the number of years the asset is expected to function profitably in use." *Massey Motors, Inc.* v. *United States*, 364 U.S. 92 (1960). This test logically assumes that when an asset can no longer be profitably used by the owner, it will be disposed of. While the physical life of the asset is certainly important in ascertaining economic life, it cannot be used as the sole criterion in determining useful life for depreciation purposes if it is shown that the asset will have a shorter economic life than physical life.

Inasmuch as the determination of the useful life is a question of fact taking into consideration many factors, we must necessarily rely, in addition to any other relevant evidence, upon the estimates testified to by those who are personally familiar with the asset and are qualified to give an expert opinion as to its approximate useful life. *Kerr-Cochran, Inc.*, 30 T.C. 69, 79 (1958); *Laura Massaglia*, 33 T.C. 379, 388 (1959), affd. 286 F. 2d 258 (C.A. 10, 1961).

At the trial, petitioners and respondent each had one witness to support their respective contentions concerning useful life. In the absence of any finding of bad faith on the part of either witness, and in view of their divergent estimates, we must weigh each estimate by analyzing the factors which the witnesses used to arrive at their conclusions. An expert's opinion is entitled to substantial weight only if it is supported by the facts. *Ariel Realty Co.* v. *Commissioner*, 115 F. 2d 659 (C.A. 2, 1940), affirming a Memorandum Opinion of this Court.

Petitioners' witness, who specializes in hotel accounts and whom respondent concedes to be an expert for this purpose, is a partner in the public accounting firm of Harris, Kerr, Forster & Co. In addition to handling the normal audit engagements and tax phases, he is particularly engaged in regard to economic situations for the hotel industry. He has engaged in extensive studies concerning the economic trends of hotels, including the Hotel Casey. The witness has han-

dled the hotel account and has visited the hotel at least yearly for over 20 years. While familiar with its physical structure, he is particularly familiar and interested in the economic situation of the hotel. Based upon his experience with hotels of similar size and specifically with his experience with the hotel itself, the structure, profit and losses sustained by both lessors and lessee, and occupancy rates, he testified that as of January 1, 1955, the period during which the hotel could be expected to be profitably used by its owners was 10 years.

Respondent's witness is a valuation engineer employed by the Internal Revenue Service to evaluate buildings for depreciation purposes. He first saw the Hotel Casey in 1960. He took into consideration the physical condition of the hotel. He did not see the record of earnings of the owners. His economic consideration, he testified, was "influenced almost entirely by the arm's-length offer" of the Roger Smith Hotel Company (hereinafter referred to as Roger Smith Hotels). The witness testified that inasmuch as the offer was greatly in excess of the adjusted basis of the hotel in 1955, such disparity meant to him a sufficient retained economic advantage from which to justify an extended useful life and increase in salvage value. Although his testimony is unclear on this point, he stated, in effect, that inasmuch as he found it so difficult to estimate what the salvage value would be before 20 years from January 1, 1955, he figured that such determination would be deferred by extending the useful life from that date to 20 years. (Respondent, however, has determined the remaining useful life as of January 1, 1955, to be 15 years with a 10-percent salvage value at that time.)

Based upon respondent's brief and his only witness on this point, it appears that the offer made by the Roger Smith Hotels was the main consideration in lengthening the useful life of the hotel. The significant problem in weighing his approach is whether the offer supports the conclusion that the useful economic life of the hotel to its owners as of January 1, 1955, was 15 years.

The adjusted basis of the hotel and land at this time was $912,364.43. Respondent contends that since the property was then "worth" $1,600,000, the building was being depreciated too quickly. He concludes that since there would have been a large sales advantage had the building been sold in 1955, there would also be a large sales advantage value in 10 years, thus justifying an addition to useful life.

We cannot accept respondent's view, however, for we do not agree with his major premise that the property was "worth" $1,600,000 in 1955. The main fallacy in respondent's reasoning lies in accepting the fact that the offer indicated that the value of the hotel was $1,600,000 in 1955. The total price is meaningless without analyzing the terms of the payment. *Edward P. Mertz*, 5 B.T.A. 694–695 (1926).

The purchasers offered to pay $250,000 in cash, assume a $250,000

first mortgage, and give a 30-year 4½-percent second mortgage for the balance in the amount of $1,100,000. This second mortgage would be given by a newly organized corporation having no security other than the hotel itself. Under the circumstances of the instant case we think it obvious that the present value of a dollar payable on the terms above described was substantially less than a dollar. *Miller* v. *United States*, 235 F. 2d 553, 556 (C.A. 6, 1956); *Thomas Palmer*, 23 B.T.A. 296 (1931).

Analyzing the circumstances in the instant case in the light of the principles discussed, we conclude that the second mortgage could not have had a present value in excess of 40 percent of face value, or approximately $440,000. Accepting the first mortgage at face value, plus cash, the total present value of the offer was approximately $940,000. The adjusted basis of the property at that time was $912,364.43.

The lack of any significant disparity between the two figures is a strong indication that the adjusted basis of the hotel approximated the present value of what was offered for it.

We, therefore, reject the conclusion reached by respondent's witness, which, as far as the economic factor is concerned, was based substantially on the inferences drawn by the witness from the Roger Smith offer.

We are satisfied that petitioners' expert witness was a qualified and credible witness, and that his conclusions were reached after due regard to factors reasonably calculated to produce a valid estimate. We conclude, therefore, that the remaining useful life of the hotel as of January 1, 1955, was 10 years.

Respondent argues the fact that over $400,000 in improvements made to the hotel in the years 1949 through 1955 affords a basis for extending the previously established useful life. The record discloses that the great bulk of these improvements was made during 1949, 1950, and 1951. It also discloses that the report recommending the extension of useful life as of 1948 was dated April 10, 1951. Although it is not known whether such improvements were taken into consideration in lengthening the useful life by 9 years as of January 1, 1948, respondent concedes on brief that the agent "might have taken some of them into account * * * but whether he did or not is not known." Although the agent testified at the trial, his testimony concerned other issues.

Assuming, however, that such improvements were not taken into account, nevertheless, in the light of the estimate given by petitioners' witness, we do not believe the fact that improvements were made, without any showing as to their effect on the composite useful life, leads to the conclusion that the useful life was lengthened. As of January 1, 1952 (after most of the improvements were made), the

hotel had a useful life according to petitioners of 13 years. The average life of hotel furniture and equipment is 12 years. Bulletin "F" (revised January 1942). Under the circumstances it would appear probable that the improvements would not survive the hotel or appreciably lengthen the life of the hotel itself.

Improvements present an important consideration concerning an asset whose useful life is the same as its physical life. The record, however, discloses that regardless of the hotel's physical condition and improvements, such useful life was still coming to an end on schedule because of outside economic factors. The population of Scranton had decreased 12 percent between the years 1950 and 1960. There had been many changes in the transient hotel industry during the 10 years ending 1956. Petitioners' expert witness testified that the small hotels in the smaller towns such as the Hotel Casey have been running into a considerable amount of financial difficulty due to the great number of motels which have been constructed. The occupancy and profits of the hotel had decreased from 66 percent in 1952 to 56 percent in 1955 and continued to decrease steadily thereafter. Petitioners are not alleging that the hotel was depreciating more rapidly than originally determined due to obsolescence, but that these obsolescent factors at least balance any benefit from improvements made. We believe the record supports their position.

For the year 1956, the petitioners, who were transferees of the hotel from the partnership, deducted depreciation based upon an assumed remaining useful life as of January 1, 1956, of 10 years. Petitioners, by amended petition, now claim, based on the testimony of their expert witness, that the remaining useful life was really 9 years.

Petitioners, of course, are not bound on this issue by the position taken in the 1956 returns, although this is a factor to be considered. After careful review of the record and consideration of the factors involved, we are satisfied that the conclusion reached by the expert witness is correct. We hold, therefore, that the remaining useful life of the hotel as of January 1, 1956, was 9 years.

Respondent has also determined that 10 percent should be deducted from the depreciable basis of the hotel as of January 1, 1955, for estimated salvage value. While petitioners have argued on brief that there will be no salvage value at the end of its useful life, the record is totally barren of any evidence or testimony supporting their position. We, therefore, conclude that petitioners have failed to sustain their burden of proof on this point and have not established error on the part of respondent in determining estimated salvage value.

IV. *Depreciation Methods.*

During the years 1956 through 1959, the transferee owners of the hotel continued to compute depreciation on their books based upon the

straight line method, as did the partnership before them. For the year 1956 (the only year in issue on this point) the straight line method was used by the owners to deduct depreciation on their individual income tax returns. Nevertheless, they now maintain that they should be allowed to amend their 1956 returns and use the 150-percent declining balance method for computing depreciation on the hotel for that year.

The 1954 regulations are explicit that any changes in the method of computing the depreciation allowance with respect to a particular account is a change in a method of accounting requiring consent, excepting only a change from the declining balance method to the straight line method. Income Tax Regs., sec. 1.167(e)–1. Moreover, section 446(e) of the 1954 Code requires that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate."

The parties agree that petitioners have not secured any consent from respondent to change their method of computing depreciation. Petitioners, however, contend that consent is unnecessary here. Although they do not support their position with any authority, their main argument presupposes that the transferee tenants in common in 1956, as the new owners of the hotel, were not bound by the partnership's method and were free to elect to use any approved method of computing depreciation, including the 150-percent declining balance method. The fact that petitioners continued to use the straight line method in 1956 was not an "election" of a method, they maintain, inasmuch as respondent redetermined the remaining useful life and salvage value for that year. Therefore, they argue they should be allowed to amend their 1956 returns and have their free choice of methods.

We think it is clear that the use of the straight line method on the books and on the 1956 income tax returns of the owners was a use by them of that method, and that they could not change to the 150-percent declining balance method without the consent of the respondent unless such consent was arbitrarily withheld.

Petitioners rely on *John F. Bayley*, 35 T.C. 288, 298 (1960). In that case, however, the issue was the timeliness of the election to use the installment method of computing gains on the sale of an asset rather than a change from one method to another. In that case, respondent determined that gain was recognizable which had been reported on the return as nonrecognizable. Inasmuch as the gains were not reported as subject to taxation, no election had been made by the taxpayer concerning the method of reporting his gain, and under the circumstances of that case an election could not reasonably have been required until respondent determined that the gain was

includible in income. Respondent nevertheless contended that because there was no election to use the installment method on the original return, the taxpayer could not at a later date elect to do so. Allowing the use of the installment method, we stated (p. 298) :

> It is our opinion that, in the circumstances here present, petitioners did make a timely election to use the installment method. An election normally implies a choice between two or more alternatives. When petitioners on their return claimed the benefit of the nonrecognition of gain provisions, they were not then electing or making a choice between reporting such gain in its entirety on the one hand, and reporting only a portion of such gain under the installment method on the other hand. Rather, the first time when petitioners were faced with the necessity of making such an election or choice was when the respondent determined that the gain was includible in income. They then did elect in their amended petition to have the gain computed under the installment method, if it should be determined that the respondent was correct. As above stated, it is our opinion that such election was timely.

Petitioners use the above language to justify their position, stating that the first time they were faced with the necessity of making an "election" was when respondent redetermined useful life and salvage value. We think, however, that the use of the word "election" merely serves to confuse the issue since here petitioners, in fact, used a method, which they now wish to change, and the problem is whether they may do so without respondent's consent. We think it obvious that they may not do so unless respondent's refusal to consent was arbitrarily withheld.

Petitioners have not established, or indeed contended, that the straight line method produces unreasonable depreciation figures based on respondent's determination.

Moreover, there is nothing in the record to warrant the conclusion that respondent arbitrarily withheld his consent. If taxpayers were permitted, at will, and without such consent, to change their method of taking depreciation every time a change in basis or estimated useful life was determined, administrative problems would vastly increase. We have no doubt that the provisions of the Code and regulations denying taxpayers the right to make changes in method without respondent's consent reflect at least in part an effort on the part of Congress and the Secretary to lessen administrative burden. We think this view is particularly applicable to efforts to make retroactive changes.

In the use of accounting methods, including depreciation methods, consistency is a very significant factor. While estimates of useful life and salvage value may vary from year to year, it is not in any sense unreasonable to require consistency of method unless the Commissioner, in the exercise of his discretion, consents to a change. The respondent's refusal to consent to a change from the accounting method actually followed by petitioners is ordinarily within his administra-

tive discretion, *Brown* v. *Helvering*, 291 U.S. 193, 204 (1934), and is not to be disturbed unless an abuse of such discretion is evident. *Schram* v. *United States*, 118 F. 2d 541 (C.A. 6, 1941). As already indicated, we fail to find in the instant case any such abuse of discretion or any action on respondent's part which would require or allow us to give petitioners the right to retroactively change their actual method of computing depreciation.

*Decisions will be entered under Rule 50.*