Wauwatosa Colony, Inc. v. Commissioner.
Wauwatosa Colony, Inc. v. Commissioner
Docket No. 2891-63.
United States Tax Court
T.C. Memo 1966-51; 1966 Tax Ct. Memo LEXIS 230; 25 T.C.M. (CCH) 298; T.C.M. (RIA) 66051; March 11, 1966
*230 Held: That the useful life of a shopping center building with certain unique architectural features is 30 years, for purposes of the depreciation deduction. Held, further: That the petitioner is not entitled to a loss deduction for the amount of a defective marblette floor's depreciated cost attributable to the portion of the floor covered with carpeting. Francis X. Krembs, for the petitioner. Denis J. Conlon, for the respondent. HOYT
Memorandum Findings of Fact and Opinion
*231 HOYT, Judge: Respondent determined the following deficiencies in income taxes for the taxable years ending on the dates indicated: June 30, 1958
$2,250.07
June 30, 1959
4,116.74
June 30, 1960
74.82
$6,441.63
One issue raised in the notice of deficiency has been conceded by the petitioner. The issues remaining for decision are whether excessive depreciation deductions were claimed with respect to a building owned by petitioner for the taxable years ending June 30, 1958 and 1959, whether the respondent correctly determined depreciation to be allowed for the taxable year ending June 30, 1960, and whether respondent erred in disallowing a loss deduction claimed for the depreciated cost of certain flooring located in the same building for the taxable year ending June 30, 1959. Findings of Fact Some of the facts have been stipulated and are found accordingly and adopted as our findings. Wauwatosa Colony, Inc., is the owner of a five-store parallel or strip shopping center building located in Wauwatosa, Wisconsin. Petitioner filed its Federal income tax returns for the years involved with the district director of internal revenue, Milwaukee, Wisconsin. It *232 has kept its books and filed its returns on the accrual method of accounting for fiscal years ended June 30. The petitioner became the owner of the shopping center building in 1951 during the early stages of its construction. The building was completed in 1952 and is of steel, concrete block, and brick construction. There is a tar and gravel roof with insulation on the roof boards, steel girders and wood joists. The front of the building is basically stone, glass, and aluminum. The facilities include air conditioning and a freight elevator. The building occupies 20,101 square feet of ground area with floor space totaling 40,200 square feet. The building was principally designed to house the operations of a tenant engaged in retail sales of exclusive ladies' apparel. The special requirements of this tenant resulted in the adoption of a unique quadlevel floor plan for the two largest stores in the building. The ladies' apparel shop has occupied an area of 26,000 square feet or about 65 percent of the building's total floor space since completion of the building. The second largest store has 8,000 square feet of floor space and is occupied by a men's and boys' apparel shop. This *233 shop adjoins the ladies' apparel shop, utilizes the same quad-level floor design, and was one of the shopping center's original tenants. Both of the shops with the quadlevel floor design use three of the levels for retail purposes, with wide, decorative stairways joining the sales area. The size and unique architectural design of the portion of the shopping center occupied by the apparel shops make this substantial area unsuitable for occupancy by retail establishments other than those engaged in the clothing business. Extensive and costly structural changes would be necessary to adapt the area for more generalized use. The apparel shops are in possession under 15-year leases with two options to renew for successive 5-year periods. The first options to renew are exercisable in 1967. It is not known whether these tenants intend to renew their leases. The remaining space in the shopping center building was occupied during the years in question by a photography supply house, a bakery, and a jewelry shop. Each of these store areas has approximately 1,000 square feet of single-level floor space. The three small stores are rented under relatively short-term leases. The shopping center *234 has space for parking about 97 automobiles in its on-site paaking area. There is also a limited amount of off-site parking available in the immediate area of the shopping center. The available parking conformed with zoning requirements at the time of construction. Measured against 1964 business standards, the amount of parking space would be considered about 50 percent below the minimum required for a successful retail operation. The building is located on North Avenue which is an arterial highway with a relatively high traffic count in the City of Wauwatosa. Wauwatosa is primarily a residential area adjoining Milwaukee. The residential construction is well maintained, and the residents of the area have above average incomes as a group. North Avenue, in the area of the shopping center, has been developed with 4- and 6-family brick apartment buildings. The shopping center building is located in a "neighborhood shopping district" which provides such necessities as food, drugs, and drygoods. The population of the surrounding area has been increasing since 1952. A regional shopping center was opened at North Avenue and Highway 100 during 1958. This center was not entirely operative *235 until some time during 1959. The entrance to the regional center is nine-tenths of a mile from the building involved in this case. There is a trend throughout the country of movement by retailers to larger regional centers where complete shopping facilities are available. The close proximity of the regional center to the subject property presents a competitive threat to tenants of the older strip development. Moreover, the petitioner faces the possibility of having its tenants move to the more popular regional centers and the difficulty of obtaining new tenants to fill vacancies. A vacancy in either of the quad-level stores would present a serious rental problem for the petitioner. It is extremely difficult to procure new tenants engaged in merchandising apparel, particularly tenants that would be interested in and capable of utilizing the special design features of the petitioner's stores. The tangible effect of the regional center on the petitioner's property is unclear. Gross rental income from the property depends to some extent on the sales of the tenants. The petitioner's gross income reached its peak in its 1957 taxable year. Gross income decreased sharply in the next three *236 years. This decline was followed by a resurgence in the taxable years of 1961 and 1962, but the earlier peak level of gross income was not reached. However, the petitioner has received a fair return on its equity investment in the property since the commencement of the rental operation. Petitioner calculated its depreciation deduction for the shopping center building on the basis of a useful life of 25 years for the taxable years of 1958 and 1959. For its 1960 fiscal year, petitioner computed depreciation on the building using a useful life of 33 1/3 years to reflect a revenue agent's adjustment using an increased useful life. The respondent determined the useful life of the subject property as being not less than 33 1/3 years and disallowed $3,952.05 of the depreciation claimed for 1958 and $3,850.11 for 1959. Due to a readjustment of the cost of depreciable assets by the respondent, allowable depreciation for 1960 was increased by $150.57 in the deficiency notice but otherwise the depreciation deduction taken in petitioner's return for that year was not changed. The second issue in this case concerns a marblette floor which was installed during the final stages of the shopping *237 center's construction in the second lowest level of the store area designed for the ladies' apparel shop. The intended purpose of the marblette floor was to provide a beautiful and decorative finished flooring which would complement the other prestige features of the store. The floor was installed by pouring the component materials over a reinforced concrete slab to a depth of two inches. Immediately after the special flooring was installed, it was discovered that the floor was defective. The color of the floor was blotchy and the texture was uneven. The floor appeared as though it had been stained, and there was some cracking. The contractor who installed the floor stated that the defects were attributable to improper curing and that the situation might improve in a year or two through natural curing. The anticipated improvement failed to occur, however, and subsequent measures, such as drilling and pumping to remove possible dampness and the use of different compounds to clean, wax, and polish the flooring, were all unsuccessful. Throughout this period the tenant frequently complained about the unsatisfactory appearance of the flooring. No matter what was done, the floor looked *238 dirty and unattractive. The contractor subsequently went out of business, and damages were never recovered. The marblette was a decorative and finished surface flooring approximately two inches thick poured on top of the concrete slab. Petitioner did not depreciate this flooring as a separate asset in its tax return for the year ending June 30, 1958, but merely included it as part of its cost for "Buildings" which were depreciated on the straightline basis. It would have cost petitioner between $10,000 and $15,000 to remove the marblette and its removal could only have been effected by tearing it out with air hammers. It was, therefore, finally decided at some undisclosed time not to remove the marblette but instead to cover all the exposed areas with padding and carpeting. The areas behind and under counters, in dressing rooms, and in some storage space were left uncovered. The petitioner took a deduction of $3,941.68, the amount of the depreciated cost of the entire floor as of June 30, 1959, from its gross income for the taxable year 1959. The respondent disallowed the deduction in full on the ground that petitioner did not incur the loss due to recarpeting in its June 30, 1959, fiscal *239 year as claimed. It was conceded by the petitioner at trial that a loss deduction should not have been taken for the uncarpeted portion of the marblette flooring, and it was suggested that this could be taken care of by a simple mathematical calculation. Neither the total area covered by marblette nor the area left uncovered after carpeting is disclosed by the record. Finding of Ultimate Fact The useful life of the shopping center building upon commencement of its use in the petitioner's business in 1952 was 30 years. Opinion Section 167(a) of the Internal Revenue Code of 1954[1] provides for a deduction of depreciation in computing taxable income. By *240 paragraph (b) of section 1.167(a)-1, Income Tax Regs., it is provided (1) that for the purpose of section 167, "the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income;" (2) that "experience with similar property taking into account present conditions and probable future developments" is a matter for consideration in determining the period of estimated useful life; (3) that other factors to consider in determining the period of useful life are "economic changes, * * * current developments within the industry and the taxpayer's trade or business;" and (4) that "The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. *241 " Respondent's determination of useful life is presumptively correct, and the burden rests with petitioner to prove that respondent's determination is erroneous. Such proof should consist of facts known or reasonably anticipated at the end of the year for which depreciation is taken. M. Pauline Casey, 38 T.C. 357, 381 (1962). Respondent determined that the useful life of the shopping center building for the taxable years in issue was not less than 33 1/3 years. The depreciation deduction taken by the petitioner for 1958 and 1959 was on the basis of a 25-year useful life, and to reflect a revenue agent's adjustment, 33 1/3 years for 1960. The respondent contends on brief that the petitioner conceded at trial that the useful life of the building for purposes of the 1960 depreciation deduction was correctly determined as 33 1/3 years, and also that the amount of the deficiency determined for that year is not contested by petitioner. After careful consideration of the whole record, we conclude that the petitioner only agreed to a stipulation that the depreciation deduction claimed *242 for 1960 had been computed on a useful life of 33 1/3 years. The petition herein specifically contests the 1960 deficiency determination as well as those for 1958 and 1959. We can only conclude that petitioner has not conceded his case for 1960, and the depreciation deduction issue is before us for all three years. The respondent further argues that the use of a 33 1/3 years useful life by petitioner in its 1960 return constitutes an admission by the petitioner of the correctness thereof. The position of the petitione with respect to useful life should not be prejudiced by a decision to abide by a revenue agent's adjustment of useful life in 1960. Even if it should be considered by us as an admission it is not binding upon us nor is it determinative of the issue. The correctness of this adjustment was put in issue by the pleadings, and the issue was not conceded at trial. The deficiency determination for 1960 must be dealt with by our decision, and since our determination of useful life affects the allowable depreciation deduction for that year, we hold that the respondent must recompute *243 the petitioner's taxable income for 1960 as well as the other years before us in conformance with our finding on the useful life issue. To meet its burden of proof, petitioner introduced the testimony of two witnesses experienced in developing and managing commercial properties and appraising commercial real estate. One of the witnesses was the president of the petitioner-corporation. However, the determination of the useful life of an asset is a question of fact, and the estimates of those personally familiar with the asset and qualified to give an expert opinion are valuable to the factfinding process. M. Pauline Casey, supra, and cases cited therein. The parties seem to agree that the most influential factor in the determination of the useful life of the particular asset involved in this case is the asset's reasonably foreseeable period of economic usefulness to the petitioner. While the physical life of the asset is important in ascertaining economic life, it cannot be used as *244 the sole criterion in determining useful life if it is shown that the asset will have a shorter economic life than physical life. The controversy between the parties on the depreciation issue is focused, therefore, upon the estimated length of the period of economic usefulness. Both of petitioner's expert witnesses were of the opinion that the useful life of the building during the years in question was 25 years. The expert witness presented by the respondent ascribed a 40-year useful life to the asset. The respondent contends that the building's useful life is not less than 33 1/3 years. In view of the divergent estimates of the experts, we must weigh each estimate by analyzing the factors which the witnesses used to arrive at their conclusions. An expert's opinion is entitled to substantial weight only if it is supported by the facts. M. Pauline Casey, supra.It is also necessary to consider the competency of witnesses to testify about certain subjects in order to give proper weight to their opinions. This we have done. After carefully considering all of these matters, *245 the testimony of the expert witnesses in the light of their qualifications and experience, as well as the other evidence of record with respect to the useful life for depreciation issue, we have concluded and found as an ultimate fact that petitioner's shopping center building had a useful life of 30 years in petitioner's business, from the commencement of its use by petitioner in 1952. Petitioner contends that it sustained a deductible loss when it carpeted a certain portion of a defective marblette floor which had been installed solely for its decorative effect as a finished flooring. The pertinent provisions of the Internal Revenue Code of 1954 are sections 165(a)[2] and 167(a). [3]The application of section 165(a) to losses arising from the permanent withdrawal of depreciable property from use in the trade or business or in the production of income is covered by section 1.167(a)-8 of the regulations. Section 1.165-2(c), Income Tax Regs.
*246 Section 1.167(a)-8 characterizes the permanent withdrawal of depreciable property as a retirement. It provides that the withdrawal "may be made by selling or exchanging the asset, or by actual abandonment" and "the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account." Where the basis of the claim of loss is physical abandonment, the applicable regulation is paragraph (a)(4) of section 1.167(a)-8. Paragraph (a)(4) reads as follows: Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition. The parties have argued the deductible loss issue *247 on a theory of physical abandonment. In order to establish actual physical abandonment, there must be an intention on the part of the owner to abandon the property coupled with an act of abandonment, both to be ascertained from all the facts and circumstances. United California Bank, 41 T.C. 437 (1964), affd. per curiam 340 F. 2d 320 (C.A. 9, 1965). The petitioner argues that the act of carpeting indicates an intention to abandon the asset as decorative flooring and also constitutes an act of abandonment. Petitioner contends further that the actual removal of the asset is unnecessary to establish an abandonment loss when the removal would serve no purpose and result in needless expense. Hummel v. United States, 227 F. Supp. 30 (N.D. Cal., 1963), is cited in support of the preceding proposition. In that case, however, the abandoned structure was never completed to a stage where it could be used as a permanent improvement and the corporation for whose particular use the construction project was originally designed and undertaken had been liquidated. The court found that there was an intent to abandon the property, that the termination of *248 the taxpayer's business constituted an irretrievable relinquishment of the asset and that the assets involved were completely lacking in all value and utility. Due to the distinguishable features of the Hummel case, supra, it is of little value in a situation involving the peculiar facts of the instant controversy. We find that the requirements for the physical abandonment of a depreciable asset as set forth in paragraph (a)(4) of section 1.167(a)-8 of the regulations and as construed by the cases, have not been satisfied by the present factual situation. There has been no relinquishment of actual physical possession of the asset; it is still in place as part of petitioner's building being used as a subfloor beneath the carpeting. Moreover, it is well recognized that a loss deduction may be claimed only when there is a closed transaction during the taxable year, generally evidenced by the sale of the assets, or abandonment of the assets, as completely worthless. Reporter Pub. Co., Inc. v. Commissioner, 201 F. 2d 743 (C.A. 10, 1953), affirming 18 T.C. 86 (1952), *249 certiorari denied 345 U.S. 993 (1953). The evidence of record here does not establish that there was a closed transaction in 1959 or support the view that the marblette flooring had no useful purpose or value as part of petitioner's building after it was partially covered with carpeting. Petitioner has also failed to present evidence which establishes the amount of the loss and the taxable year in which the loss was sustained. The record does not indicate that the marblette was actually covered with carpeting in 1959, the year in which the loss deduction was claimed. All that is disclosed by the evidence is that petitioner wrote off the depreciated cost of the flooring in its June 30, 1959, fiscal year. Furthermore, part of the marblette floor was left uncarpeted, and the petitioner conceded at trial that the amount of the remaining cost attributable to the uncarpeted portion should not have been the subject of a loss deduction. The record fails to reveal any basis for determining the allowable loss deduction due to the absence of evidence concerning the total area covered by marblette or the amount of marblette actually covered with carpeting. The petitioner has utterly *250 failed to carry its burden of proof with respect to either the time or amount of its alleged loss. For all of the foregoing reasons, we hold that petitioner is not entitled to the claimed loss deduction of the depreciated cost of a defective decorative flooring partially covered with carpeting. The respondent's disallowance of this alleged loss must be sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 167. DEPRECLATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
3. Supra, footnote 1.↩