I.S.C., INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
I. S. C., Inc. v. Commissioner
Docket No. 3653-74.
United States Tax Court
T.C. Memo 1978-288; 1978 Tax Ct. Memo LEXIS 223; 37 T.C.M. (CCH) 1206; T.C.M. (RIA) 78288; July 27, 1978, Filed *223 (1) P is an accrual method taxpayer with a taxable year ending Sept. 30. On Sept. 21, 1970, the board of directors of P approved a proposed stock bonus plan, authorized execution of the plan and creation of a trust, and authorized a contribution to the trust. A written plan was executed the same day, but the trust agreement was not executed, and the contribution was not made, until June 14, 1971, one day prior to the last day for the filing of its return for the year ending Sept. 30, 1970. Held, a stock bonus trust qualified under sec. 401(a), I.R.C. 1954, did not exist in P's taxable year ending Sept. 30, 1970; therefore, P's contribution to the trust was not an accruable item for its year ending Sept. 30, 1970, and is not deductible in such year under sec. 404(a)(3) and ( 6), I.R.C. 1954. Catawba Industrial Rubber Co. v. Commissioner,64 T.C. 1011 (1975), followed. (2) Held, further, the Commissioner's determination of the useful lives of P's slag-processing equipment and of certain leasehold improvements is sustained. (3) Held, further, the Commissioner's disallowance of deductions for legal expenses *224 and for travel and entertainment expenses is sustained. Secs. 162 and 274, I.R.C. 1954. Vincent C. Murovich,Robert G. MacAlister, *228 and William C. McClure, for the petitioner. Russell F. Kurdys, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Taxable Year Ending
Deficiency
Sept. 30, 1966
$ 58,737.95
Sept. 30, 1970
223,883.13
The deficiency for the year ending September 30, 1966, resulted from adjustments to income for the year ending September 30, 1969, which led to a decrease in the net operating loss to be carried back to the year ending September 30, 1966. The issues remaining for decision are: (1) Whether the petitioner established a stock bonus trust qualified under section 401(a) of the Internal Revenue Code of 1954[1] by September 30, 1970, the final day of its taxable year; (2) whether the petitioner has proved that the Commissioner erred in lengthening the useful lives it assigned to certain equipment, machinery, and leasehold improvements for purposes of computing its depreciation deductions; and (3) whether the petitioner has substantiated deductions it claimed for legal expenses and for *229 travel and entertainment expenses. If we find that the petitioner established a qualified stock bonus trust as of September 30, 1970, we must also determine the fair market value of 25.3 shares of stock contributed by it to such trust on June 14, 1971, for purposes of establishing the amount of the deduction to which it is entitled under section 404(a)(3) and (6). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, I.S.C., Incorporated (I.S.C.), is a Pennsylvania corporation which had its principal office in Pittsburgh, Pa., at the time it filed its petition in this case. I.S.C. was incorporated on September 23, 1957, as W & T Salvage Co. W & T Salvage Co. and its subsidiary corporations filed a consolidated Federal income tax return for the taxable year ending September 30, 1966, with the District Director of Internal Revenue, Pittsburgh, Pa. The name W & T Salvage Co. was changed to I.S.C., Incorporated, as of January 1, 1967. I.S.C. and its subsidiaries filed consolidated Federal income tax returns for the *230 taxable years ending September 30, 1969, and September 30, 1970, with the Internal Revenue Service Center, Philadelphia, Pa. The returns for the years ending September 30, 1964 through September 30, 1969, were prepared and filed using the cash method of accounting. For the year ending September 30, 1970, and thereafter, I.S.C. prepared and filed its returns using the accrual method of accounting. On September 21, 1970, the board of directors of I.S.C. held a meeting for the purpose of considering the establishment of an employee stock ownership plan (the plan). The minutes of such meeting recite that: Copies of the proposed Stock Bonus Plan and Trust Agreement were submitted to the meeting and all of the relevant provisions were discussed by the Directors. Thereupon, on motion duly made, seconded and unanimously carried, it was: RESOLVED, that the proposed Employee Stock Ownership Plan be and the same is hereby approved and adopted, and that the appropriate officers of the Company be and are hereby authorized and directed to cause said Plan to be duly executed and disclosed to the Employees. * * *
The Chairman pointed out that contributions under the Employee Stock *231 Ownership Plan are not required to be actually made until the time of filing of the Federal Income Tax Return of the Company for the fiscal year. However, the Chairman suggested that since the Plan as approved contemplated the use of an Employee Stock Ownership Trust, the proposed Trust Agreement creating such a Trust should be considered and approved at this meeting. Accordingly, the Chairman submitted to the meeting a copy of the proposed Employee Stock Ownership Trust Agreement naming The Union National Bank of Pittsburgh as the proposed Trustee. After discussing the various provisions of the proposed Trust Agreement, upon motion duly made, seconded and unanimously carried, it was: RESOLVED, that the foregoing Employee Stock Ownership Trust Agreement submitted to the meeting be and the same is hereby adopted and approved, and that the appropriate officers of the Corporation be and the same are hereby authorized to execute and deliver the same to The Union National Bank of Pittsburgh for its execution prior to the date of the initial required contribution under the new Plan.
RESOLVED FURTHER that The Union National Bank of Pittsburgh be and the same is hereby appointed *232 as Trustee under the foregoing Trust Agreement subject to the acceptance and execution of the same by said bank. RESOLVED FURTHER that the Secretary is hereby instructed to attach copies of the foregoing Plan [and] Trust Agreement * * * to the minutes of this meeting. [Emphasis supplied.] At the September 21, 1970 meeting, the board of directors also appointed a committee to administer the plan. It was further "irrevocably determined" that I.S.C's contribution to the plan for its year ending September 30, 1970, should be equal to 15 percent of the total compensation of all participating employees. As authorized by the board of directors, the plan was executed on September 21, 1970. The plan provided for contributions to a trust to be administered for the exclusive benefit of participants and their beneficiaries. The plan also provided that "Neither amendment nor termination shall retroactively reduce the rights of participants nor permit the use of any part of the Trust Fund for any purpose other then [sic] for the exclusive benefit of the participants and their Beneficiaries." With respect to the trust, the plan contained the following definitions: Trust: The *233 Trust created by the Trust Agreement entered into between the Company and the Trustee. * * * Trust Agreement: The Agreement between the Company and the Trustee or any successor trustee, establishing the Trust and specifying the duties of the Trustee. The plan also stated: "A copy of the Trust Agreement is available for your review in the Company's office." However, the trust agreement was not executed by I.S.C. and The Union National Bank of Pittsburgh until June 14, 1971, and no copy of a proposed trust agreement was attached to the minutes of the September 21, 1970 meeting. The trust agreement, as executed, provided that it was to be effective as of October 1, 1969. On June 14, 1971, the board of directors of I.S.C. held another special meeting to determine the fair market value, as of September 30, 1970, of the common stock of I.S.C. At such meeting, the board of directors approved a fair market value of $ 15,514.56 per share. The directors resolved that a contribution be made to the trust in the aggregate sum of $ 392,518.50, which sum was stated to be equal to 15 percent of the compensation of all participating employees, for the year ending September 30, 1970. They *234 further resolved that such contribution be made in shares of the company's common stock, based on a pershare valuation of $ 15,514.56, and authorized the issuance and delivery to the trustee of 25.3 shares from I.S.C.'s authorized but unissued stock. The shares were delivered to the trustee on June 14, 1971, one day prior to the last day for the filing of I.S.C.'s return for the year ending September 30, 1970. On June 16, 1971, I.S.C. filed an Application for Determination under sections 401(a), 405(a), and 501(a) (Form 4573), with the District Director, Internal Revenue Service, Pittsburgh, Pa. In such application, I.S.C. stated that the plan was adopted on September 21, 1970, and that the trust was executed on June 14, 1971. In a determination letter dated September 21, 1971, the district director advised I.S.C. that its plan, as amended, [2] was qualified under section 401(a). *235 On its Federal income tax return for the year ending September 30, 1970, I.S.C. deducted $ 392,518.50 for its contribution to the plan. In its statement in support of such deduction, it stated: "The trust or contract and any amendments thereto were put into effect so that contributions thereunder were irrevocable on September 21, 1970." The Commissioner disallowed such deduction, claiming that the trust, which was part of the plan, was not in existence during the year ending September 30, 1970. The Commissioner further claimed the 25.3 shares did not have an aggregate value of $ 392,518.50 as claimed in I.S.C.'s return for such year. During the years at issue, the principal business of I.S.C. was the processing of slag from steel mills and the reclamation of iron material remaining in the slag. In addition, wholly owned subsidiary corporations were engaged in the construction business and in the restaurant business. From 1957 through 1972, I.S.C. conducted a slag-processing operation under a contract with Jones & Laughlin Steel Corporation (J & L). The slag-processing operation involved loading molten slag onto trucks. The slag was then taken to a reclamation area, where *236 slag with a high metal content was magnetically separated from that with a lower metal content. The slag with a high metal content was sold back to J & L to be used as raw stock. The remainder was either used as land fill or discarded. The trucks, crawlers, and other machinery and equipment used to transport and process the slag were subject to severe use.
During the year ending September 30, 1970, I.S.C. had 34 Euclid trucks and 2 Euclid crawlers which were used in its slag-processing operation. All of such trucks and crawlers had been acquired used. Of the trucks and crawlers listed on I.S.C.'s depreciation schedule for 1970, 4 had been acquired in 1958, 6 had been acquired in 1960, 19 had been acquired in 1965, and 7 were acquired and placed in use in 1970. I.S.C. assigned a useful life of 5 years to the trucks acquired in 1958 and 1960; these had been fully depreciated but were still listed on its depreciation schedule for the year ending September 30, 1970. It assigned a useful life of 4 years to all other Euclid trucks and crawlers, except for one crawler acquired in 1970, to which a 6-year life was assigned. In his notice of deficiency, the Commissioner determined that *237 the Euclid trucks and crawlers had a useful life of 8 years. He decreased I.S.C.'s depreciation deductions for its years ending September 30, 1969, and September 30, 1970, accordingly. From 1958 to 1970, I.S.C. acquired new equipment for the J & L slag operation at a total cost of approximately $ 955,000. Equipment costing approximately $ 552,000 was acquired during the years 1958 through 1961 and had been fully depreciated, but was still listed on I.S.C.'s depreciation schedule for the year ending September 30, 1970. From 1962 through 1970, I.S.C. acquired new equipment at a cost of $ 403,425; such equipment was not fully depreciated and was listed on its depreciation schedule for the year ending September 30, 1970. The Commissioner determined that 14 of the items had 10-year useful lives rather than the 6- or 8-year lives claimed by I.S.C., and that three of the items had 8-year lives rather than the 6-year lives claimed by I.S.C. He decreased I.S.C.'s depreciation deductions for its years ending September 30, 1969, and September 30, 1970. [3]
*238 I.S.C. had an excellent garage and maintenance facility located at the J & L slag-processing jobsite which was staffed by experienced employees. This excellent maintenance resulted in extending the useful lives of machinery and equipment beyond the lives claimed. I.S.C. did not capitalize any of its expenses for repairs and maintenance of such equipment, nor did it provide any allowance for salvage in its depreciation computations. In May of 1966, I.S.C. expended $ 37,023.64 for improvements to the office building which it used in its operations. On June 1, 1967, it expended an additional was purchased by I.S.C.'s then vice president, Vincent The building J. White, Sr., [4] and his wife on January 6, 1966, for $ 25,000.00 and was leased by them to I.S.C. In 1966, the office building was moved back from the highway by the Mobil Oil Co. (Mobil). Upon moving it back, Mobil added *239 an unfinished floor to the building of about 1,500 square feet, which was the site of the leasehold improvements. The improvements consisted of both decorative items and structural components. In April of 1969, I.S.C. and Mr. and Mrs. White entered into a 13-year lease, under the terms of which I.S.C. agreed to pay $ 2,000 per month rent. I.S.C. assigned a 5-year useful life to the improvements made in May of 1966 and a 4-year useful life to the improvements made in June of 1967. The Commissioner assigned a useful life of 13 years from September 30, 1968, to all leasehold improvements. He adjusted I.S.C.'s depreciation deductions for the years ending September 30, 1969, and September 30, 1970, accordingly. The Commissioner disallowed the following amounts for legal expenses and for travel and entertainment expenses for the years ending September 30, 1969, and September 30, 1970: Payee and/or
Year Ending
Year Ending Nature of Item
9/30/69
9/30/70
a. G. Walters - reimbursement
for payment to V. Murovich
of counsel fees
$ 500.00
b. V. Murovich - counsel fees
519.66
c. Counsel fees
1,037.66
d. TWA
$ 102.90
e. Union National Bank of
Pittsburgh
2,727.00
f. Mayflower Hotel,
Washington, D.C.
172.70
g. Air travel to Chicago
119.99
h. American Express - misc.
expenditures
1,140.17
i. Kaufman's
564.10
j. Chartiers Country Club dues
300.00
k. Pittsburgh Athletic Associa-
tion - house charges
775.08
l. Swings, slides, etc.
1,215.03
*240 In the notice of deficiency, items a. and b. were erroneously included as travel and entertainment expenses. Item c., legal expenses, was disallowed on the grounds that such expenses were incurred in connection with a merger and a change in corporate name and therefore were capital expenditures. [5] Item k. was erroneously labeled as having been incurred for "Judo Lessons & Uniform." With respect to item 1., the deficiency notice stated: "It is determined that $ 1,215.03 was expended for the purchase of a fince [sic] for the principal stockholder. This amount is disallowed an [sic] an expense and taxed to the principal as a dividend." The travel and entertainment expenditures were disallowed on the grounds that it had not been established that such amounts represented ordinary and necessary business expenses and that such expenses had not been substantiated as required by section 274. OPINION The first issue we must decide is whether the petitioner is entitled to deduct, under section 404(a), the contribution paid to its stock bonus trust *241 on June 14, 1971.
Section 404(a) provides generally that an employer's contributions to or under a stock bonus plan shall be deductible if they satisfy the conditions of either section 162 or 212 and if they satisfy the additional limitations in section 404(a). Section 404(a)(3)(A) provides that contributions paid into a stock bonus trust shall be deductible in the taxable year when paid, if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a). [6] However, section 404(a)(6) provides that for purposes of section 404(a)(3)(A), a taxpayer on the accrual method shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year, including any extensions. Section 501(a) provides that an organization described in section 401(a) shall be exempt from tax. *242 Section 401(a) provides that a United States trust forming part of a stock bonus plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust if the requirements thereafter set forth are met. The initial requirement, set out in section 401(a)(1), is that contributions are made by an employer for the purpose of distributing to such employees and their beneficiaries the corpus and income of the trust in accordance with the plan. Section 401(a)(2) provides that the trust shall be qualified: (2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be * * * used for, or diverted to, purposes other than for the exclusive benefit of * * * employees or their beneficiaries; Section 401(a)(3) and (4) requires that certain percentages or classifications of employees be entitled to benefits under the plan, and that contributions or benefits do not discriminate in favor of officers, *243 shareholders, supervisory personnel, or highly compensated employees. The remaining paragraphs of section 401(a) deal with acceptable classifications for coverage purposes and employee-participants' rights under the plan and trust. As a result of these complex provisions, the deductibility of the petitioner's contribution to the stock bonus trust turns on whether the trust was qualified under section 401(a) on or before September 30, 1970. The parties agree that sections 401(a) and 404(a)(3)(A) clearly contemplate the existence of a trust within the taxable year for which deductions for contributions are claimed, but disagree as to what actions must be taken to create a trust. The Commissioner's long-established view is that there must be executed, during the taxable year, a written trust instrument which definitely and affirmatively prohibits the diversion of trust funds in accordance with section 401(a)(2). Rev. Rul. 69-421, 1969-2 C.B. 59, 63; Rev. Rul. 69-231, 1969-1 C.B. 118; see also sec. 1.401-2(a)(2), Income Tax Regs.; Rev. Rul. 61-157, 1961-2 C.B. 67, 78; Rev. Rul. 57-163, 1957-1 C.B. 128. *244 On the other hand, the petitioner argues that a trust complete under local law came into existence on September 21, 1970, and that it is sufficient that a written trust agreement was executed during the period provided for making a contribution under section 404(a)(6). The issue has arisen in a variety of situations. Compare Catawba Industrial Rubber Co. v. Commissioner,64 T.C. 1011 (1975); Barrett Timber & Dunnage Corp. v. Commissioner,29 T.C. 76 (1957); Abingdon Potteries, Inc. v. Commissioner,19 T.C. 23 (1952), with Dejay Stores, Inc. v. Ryan,229 F. 2d 867 (2d Cir. 1956); Hill York Corp. v. United States, an unreported case ( S.D. Fla. 1964, 14 A.F.T.R. 2d 5160, 64-2U.S.T.C. par. 9654). It is the position of this Court that before the end of the taxable year, some definitive action to create a trust which would be binding upon the parties is required. Catawba Industrial Rubber Co. v. Commissioner,supra at 1017. A careful review of the facts has convinced us that the petitioner took no such definitive action to create a trust prior to September 30, 1970, the *245 last day of its taxable year. The petitioner's board of directors met on September 21, 1970, and approved a draft of the proposed plan and a proposed trust agreement. The plan was executed by the president and secretary of the corporation the same day. Although the minutes of the board of directors' meeting directed that a copy of the proposed trust agreement be attached thereto, no copy of such agreement was attached to the minutes. Thus, we do not know what terms were contained in the proposed trust agreement. Moreover, the trust agreement was not executed by the appropriate officers of the petitioner and the trustee until June 14, 1971. The petitioner has offered no explanation of this delay in executing the trust agreement, nor has it offered any evidence that, prior to September 30, 1970, the proposed trustee had agreed to serve in that capacity, or that the terms of the trust had been discussed with the proposed trustee. This Court was faced with similar facts in Catawba Industrial Rubber Co. v. Commissioner,supra. In that case, the board of directors of the taxpayer held a special meeting to approve a profit-sharing plan and trust 5 days before *246 the close of its taxable year ending April 30, 1972. The directors discussed and approved the plan and trust and authorized a donation of $ 100 to the trust in order to make the trust operative. They also approved a resolution directing the officers of the taxpayer to make a contribution equal to 15 percent of the gross annual payroll to the trust each year. The trust agreement and plan were not executed until June 14, 1972, a date within the taxpayer's filing period; however, it was stipulated that the trust agreement executed on June 14, 1972, was essentially the same as that considered by the ending September 30, 1970, the contribution paid on June 14, board of directors during the taxable year. A contribution was made within the period prescribed by section 404(a)(6). The Court found that no trust existed during the taxable year at issue. 64 T.C. at 1017. The petitioner argues that the fact that it executed a written plan prior to the end of the taxable year is sufficient to make the case before us distinguishable. However, a careful reading of Catawba has caused us to reject the petitioner's contention. In that case, the Court pointed out that the requirements *247 of section 401(a) for a qualified trust are very technical and stringent, and required that "some definitive action" be taken to create such a trust. 64 T.C. at 1017. The Court rejected the taxpayer's argument that execution of a written trust agreement within the 2-1/2 month grace period prescribed by section 401(b) for amending certain plan provisions was sufficient to establish a qualified trust. The Court stated: It thus seems mandatory that a trust meeting * * * [the conditions of section 401(a)(1) and (2)] be in existence during the taxable year and qualifying life cannot be retroactively breathed into it through the medium of section 401(b). * * * [64 T.C. at 1018.] The Court so held despite the fact that it was stipulated that the trust agreement considered and approved by the board of directors before the close of the taxable year was essentially the same as the trust agreement which ultimately was executed, a fact which cannot be found in the case before us. The petitioner argues that under Pennsylvania law, a valid oral trust was created *248 as of September 21, 1970. Under Pennsylvania law, it is essential to the creation of a trust that there be: (1) A trustee; (2) a trust res; (3) a beneficiary toward whom the trustee has clear and specific duties; and (4) a transfer of legal title of the res to the trustee. [7]Sherwin v. Oil City National Bank, 229 F. 2d 835, 838-839 (3d Cir. 1956). Although Pennsylvania law recognizes oral trusts of personalty, the terms of an oral trust must be proved by evidence that is clear, precise, indubitable, and unequivocal. Bair v. Snyder County State Bank, 314 Pa. 85, 171 A. 274, 275 (1934); Girard Life Insurance, Annuity & Trust Co. v. Mellor, 156 Pa. 579, 27 A. 662, 666-667 (1893). Moreover, the expression of a mere intent or agreement to create a trust is not sufficient to prove the existence of a trust. Van Sciver v. Rothensies,36 F. Supp. 577, 579 (E.D. Pa. 1941), affd. 122 F. 2d 697 (3d Cir. 1941). The fact that the settlor of the trust contemplates the subsequent execution of a formal trust instrument *249 is persuasive evidence that he does not intend to create the trust until the instrument is executed. 1 A. Scott, Trusts 220 (3d ed. 1967). In our view, the minutes of the September 21, 1970 meeting do not prove an intent to create a present trust, but show clearly only an intention to create a trust in the future. The language of the minutes shows that the board of directors contemplated that execution of the trust agreement was necessary to the creation of the trust. Nor is the fact that the directors resolved to appoint the Union National Bank (the bank) as trustee sufficient to prove an intention to create a present trust. The bank was referred to as the proposed *250 trustee, and its appointment was subject to its acceptance and execution of the trust agreement. Moreover, there is nothing in the record to indicate the terms of the proposed trust agreement, or that such terms were discussed with representatives of the bank prior to September 30, 1970. The direction to execute the trust agreement and to deliver it to the bank "prior to the date of the initial required contribution under the new Plan" shows that the directors did not contemplate executing the trust agreement during the taxable year; it was sufficient, they believed, that the trust agreement be executed before the initial contribution was made. A further indication of their intention at that time is contained in the application for approval of the plan, in which it was declared that the trust was created on June 14, 1971. Thus, we cannot find that on or before September 30, 1970, there was created a trust under which the trustee had clear and specific duties, as required by Pennsylvania law. Sherwin v. Oil City National Bank, supra.
The petitioner relies on the case of Dejay Stores, Inc. v. Ryan,supra, to support its argument that as of *251 September 21, 1970, a valid trust had been created. However, in Dejay Stores, the taxpayers had, prior to the close of the taxable year, settled all the terms and conditions of a pension trust for the benefit of their employees and had agreed with the proposed trustee upon the terms of the trust instrument. 229 F. 2d at 869. The court found that every element of a trust came into existence before the close of the taxable year. There was no such agreement with the proposed trustee in the case before us.Moreover, the court's statements with respect to creation of the trust were dicta; the court decided that the contribution was not deductible, because the plan had not been approved by the shareholders of the taxpayers, as required by the plan. 229 F. 2d at 870-871. The petitioner also has argued that as the trust was part of its stock bonus plan, execution of the plan on September 21, 1970, constituted execution of the trust. The petitioner's argument is that the trust agreement is incorporated by reference into the plan, thereby rendering all the terms of the trust agreement terms of the plan. Again, the language of the plan clearly contemplates *252 that execution of the trust agreement was necessary to create the trust. Moreover, no trust agreement was attached to the plan executed September 21, 1970. In light of these facts, we can give no weight to the petitioner's argument.
Section 404(a)(6) provides that for purposes of section 404(a)(3), a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such year. [8] However, section 404(a)(6) applies only where the taxpayer has incurred a liability to make the contribution to the trust within the prior taxable year. Barrett Timber & Dunnage Corp. v. Commissioner, 29 T.C. at 77-78; Abingdon Potteries, Inc. v. Commissioner, 19 T.C. at 26-27. In view of the fact that the trust was not created until after the close of the taxable year, the petitioner could not have incurred any liability to contribute to such trust during the taxable year. Abingdon Potteries, Inc. v. Commissioner, supra. *253 Accordingly, it is not entitled to deduct for its year 1971. In light of our holding, we need not determine the fair market value of the 25.3 shares of stock contributed to the trust. The next issue we must decide is whether the Commissioner erred in increasing the useful lives claimed by the petitioner for purposes of computing depreciation deductions for certain new and used slag-processing equipment and for certain leasehold improvements. Section 167(a) permits a taxpayer to deduct a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business. The purpose of the deduction for depreciation is to permit the taxpayer to recover, over the useful life of the property, its cost or other basis. Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 16 (1940); Southeastern Building Corp. v. Commissioner, 3 T.C. 381, 388 (1944), *254 affd. 148 F. 2d 879 (5th Cir. 1945), cert. denied 326 U.S. 740 (1945). Useful life is defined in section 1.167(a) - 1(b), Income Tax Regs., as "not necessarily the useful life inherent in the asset but * * * the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business." See also Massey Motors, Inc. v. United States, 364 U.S. 92, 96 (1960). Such regulations further provide that useful life: shall be determined by reference to * * * [the taxpayer's] experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements *255 . * * * [Sec. 1.167(a)-1 (b), Income Tax Regs; emphasis supplied.] The useful life of property is a question of fact, to be determined on the basis of all of the facts and circumstances reasonably know or anticipated at the end of the year for which depreciation is taken. Casey v. Commissioner, 38 T.C. 357, 381 (1962); Radio Station WBIR, Inc. v. Commissioner, 31 T.C. 803, 817 (1959); Bullock v. Commissioner, 26 T.C. 276, 281 (1956), affd. per curiam 253 F. 2d 715 (2d Cir. 1958). The petitioner has the burden of proving that the Commissioner's determination of the useful lives of its slag-processing equipment and leasehold improvements was erroneous. Bell Electric Co. v. Commissioner, 45 T.C. 158, 167 (1965). With respect to the useful lives of its slag-processing equipment, the petitioner offered the testimony of its president, Mr. White, and an equipment salesman to support the lives claimed by it. Mr. White merely went through a list of the items of equipment at issue *256 and disagreed with the Commissioner's determination of useful lives. The equipment salesman, who had sold to the petitioner some of the Euclid trucks at issue, testified that the useful life of such trucks is 4 years. However, he also testified that the trucks could be rebuilt three or four times, using the basic frame, assuming complete and total maintenance. Mr. White's conclusory testimony is not sufficient to meet the petitioner's burden of proof, especially when we consider the fact that the petitioner retained on its depreciation schedule many items which had been fully depreciated. The salesman's testimony concerning the rebuilding of the trucks tends to support the Commissioner's determination. On brief, the petitioner has argued that it was able to use its slag-processing equipment beyond the life claimed only because of its policy as to maintenance and repairs. It has argued that these factors are irrelevant in determining useful life.However, its position is without legal foundation. Sec. 1.167(a)-1(b), Income Tax Regs.; cf. Casey v. Commissioner, 38 T.C. at 384. The petitioner also maintained on brief that it retained *257 on its depreciation schedules and its balance sheet many assets which in fact had been abandoned and were no longer in use. It offered no explanation for such practice and no proof to support its allegations. Accordingly, we attach no weight to such argument. The petitioner has failed to meet its burden of proof, and the Commissioner's determination of the useful lives of Commissioner's determination that the composite useful We must also determine whether to sustain the Com7issioner's determination that the composite useful life of the leasehold improvements made by the petitioner was 13 years as of September 30, 1968. We found the record on this issue to be very confusing. It appears that some of the improvements were structural, whereas others were merely decorative, and we have so found. Although Mr. White also testified as to this issue, he was unable to offer even a rough approximation as to how much was expended for particular types of improvements. The Commissioner's position is that the improvements should be depreciated over the remaining term of the lease. Sec. 1.167(a)-4, Income Tax Regs. The petitioner's position is that the useful *258 life of the improvements made in 1966 is 5 years, and that the useful life of the improvements made in 1967 is 4 years. In view of the petitioner's failure to adduce any evidence on the basis of which we can arrive at a determination of useful life, we must sustain the Commissioner's determination. Bell Electric Co. v. Commissioner,45 T.C. at 167; Casey v. Commissioner,38 T.C. at 381. Finally, we must decide whether the petitioner is entitled to deduct the amounts claimed for legal expenses and for travel and entertainment expenses. Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The petitioner has the burden of proving it is entitled to the deductions claimed. Rule 142(a), Tax Court Rules of Practice and Procedure; cf. Welch v. Helvering,290 U.S. 111 (1933). To sustain its burden, the petitioner must show not only the amounts expended, but also that the expenses were of a nature so related to its business as to be ordinary *259 and necessary expenses. Robinson v. Commissioner,51 T.C. 520, 534 (1968), affd. per curiam on this issue 422 F. 2d 873 (9th Cir. 1970); Walet v. Commissioner,31 T.C. 461, 470 (1958), affd. per curiam 272 F. 2d 694 (5th Cir. 1959); Ihrig v. Commissioner,26 T.C. 73, 76 (1956). Personal expenses and capital expenditures are not deductible. Secs. 262 and 263. With respect to the petitioner's claimed legal expenses, the only evidence was the testimony of Mr. White. He testified with respect to the$ 500 payment to Mr. Walters that Mr. Walters erroneously paid legal fees which were in fact the petitioner's obligation. He further testified that the fees were incurred in connection with the drafting of a buy-sell agreement with respect to Mr. Walters' stock. Mr. White testified that the expenditure of $ 519.66 was for legal fees incurred in connection with a corporate name change. With respect to the expenditure of $ 518.00 for legal fees, the petitioner argued that such item was a duplication, that is, that the Commissioner had disallowed the same item twice, and also argued that the Commissioner had *260 conceded such item. With respect to the $ 500.00 reimbursement to Mr. Walters, on this record we are not convinced that the legal fees were in fact an ordinary and necessary business expense of the petitioner, rather than a personal expense of Mr. Walters. The $ 519.66 expense for legal fees incurred in connection with a corporate name change clearly constitutes a nondeductible capital expenditure. Quality Brands, Inc. v. Commissioner,67 T.C. 167, 176 (1976). Finally, in his notice of deficiency, the Commissioner disallowed legal expenses in the amount of $ 1,037.66. At the trial, he conceded $ 519.66 of such amount as duplicative of an amount disallowed elsewhere. After a review of the record, we have accepted the petitioner's contention that the $ 518.00 item also is duplicative of an amount already disallowed. The remainder of the deductions in dispute are for travel and entertainment expenses. Such expenses not only must fulfill the conditions of section 162, but also must satisfy the requirements of section 274 in order to be deductible. Section 274(d) requires *261 that the taxpayer substantiate "by adequate records or by sufficient evidence corroborating his own statement" the amount of the expense, the time and place of the travel or entertainment, the business purpose of the expense, and the business relationship to the taxpayer of the persons entertained. Regulations promulgated pursuant to the statute provide that in order to meet the "adequate records" requirement, a taxpayer must maintain an account book, diary, statement of expense, or similar record prepared contemporaneously with the expenditure and, in certain situations, documentary evidence, such as receipts or paid bills. These records must be sufficient to establish each element-- amount, time, place, business purpose, and business relationship--of an expenditure. Sec. 1.274-5(c), Income Tax Regs. This Court has sustained the validity of such regulations. Sanford v. Commissioner,50 T.C. 823 (1968), affd. per curiam 412 F. 2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). In the absence of adequate records *262 to substantiate each element of an expense, a taxpayer may alternatively establish such element: (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and
(ii) By other corroborative evidence sufficient to establish such element. If such element is * * * the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is either the business relationship to the taxpayer of persons entertained or the business purpose of an expenditure, the corroborative evidence may be circumstantial evidence. [Sec. 1.274-5(c)(3), Income Tax Regs.; emphasis supplied.] Items d. through h., as set forth in our findings of fact, represent amount s deducted for travel expenses. With respect to each such item, the parties stipulated the amount expended and the payee or nature of the expense. At the trial, no books of account, *263 diaries, or other similar records were introduced into evidence.The only evidence consisted of the testimony of the petitioner's president, Mr. White. Mr. White's testimony with respect to such expenditures was vague and unsatisfactory. For example, the amounts paid to TWA and to the Mayflower Hotel, Washington, D.C., allegedly were expended during trips to visit a business consultant in Washington, D.C. Mr. White had difficulty during his testimony recalling the purposes of such expenditures. In fact, it was clear that he did not specifically recall the trips; he admitted he "assumed" the trips to Washington were to meet with the business consultant because this would have been his only reason to go there.Mr. White's only testimony with respect to the $ 2,727.00 paid to the Union National Bank of Pittsburgh was that it represented expenses incurred by another officer of the petitioner to travel to Europe, where he stayed "a couple of weeks." The alleged purpose of the trip was "to make inroads" in the European market. The $ 119.99 expense for air travel to Chicago was allegedly incurred by Mr. White and his wife to fly to Chicago to attend the funeral of a business associate. *264 Finally, the $ 1,140.17 paid to American Express purportedly was incurred in connection with a convention of the Scrap Institute, which Mr. Walters and his wife attended. Mr. White could not recall where or when the convention occurred, or how long the Walters stayed at the convention. Mr. White's testimony is not sufficient to satisfy the requirement of section 274(d) or the regulations thereunder, which require specific information in detail as to each element of an expense. Ashby v. Commissioner,50 T.C. 409, 415 (1968). Moreover, no evidence was offered to confirm his testimony as to any of these trips; therefore, we find that the petitioner has failed to submit sufficient corroborating evidence, as required by section 274(d). Rutz v. Commissioner,66 T.C. 879, 885 (1976); Buddy Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 644 (1975). Accordingly, the Commissioner's disallowance of the petitioner's travel expense deductions is sustained. The remaining deductions at issue were for entertainment facilities. Section *265 274(a)(1)(B) provides with respect to expenditures for facilities used for entertainment that no deduction shall be allowed "unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business." An entertainment facility is considered to meet the requirements of section 274 (a)(1)(B) only if it is established that the primary use of the facility during the taxable year was for business purposes under section 162 and the regulations thereunder. Sec. 1.274-2(e)(4)(i), Income Tax Regs. A taxpayer shall be deemed to have established that an entertainment facility was used primarily for the furtherance of its trade or business if it establishes that more than 50 percent of the total calendar days of use of the facility during the taxable year were days of business use. Sec. 1.274-2(e)(4)(iii). Under the regulations, a taxpayer is required to maintain detailed records of each use of an entertainment facility; if he fails to maintain such records with respect to a facility which is likely to serve personal purposes, it *266 shall be presumed that the use of such facility was primarily personal. Sec. 1.274-5(c)(6)(iii). During 1970, the petitioner expended $ 564.10 for furniture for an apartment it maintained, $ 300.00 for dues at the Chartiers Country Club, $ 775.08 for house charges at the Pittsburgh Athletic Association, and $ 1,215.03 for the installation of an elaborate set of swings, slides, and seesaws at the home of Mr. White. The petitioner kept no records of the use of any of its entertainment facilities. Again, the only evidence that was offered was the testimony of Mr. White. Mr. White's testimony consisted of conclusory statements to the effect that all of the facilities were used only for business purposes. His uncorroborated testimony is not sufficient to establish that the facilities were used primarily in the furtherance of the petitioner's business. Ashby v. Commissioner,50 T.C. at 417. It is not clear as to what extent the "house charges" for the Pittsburgh Athletic Association represented dues or to what extent they represented charges for particular services; in either event, it is clear that the petitioner has failed to furnish the type of proof required *267 to support a deduction for such charges. Accordingly, the Commissioner's disallowance of the petitioner's deductions for entertainment facilities is sustained. [9]
Finally, we must consider an argument which the petitioner raised on brief with respect to its expenditure for the slides, swings, and seesaws. In the notice of deficiency, the Commissioner labeled as a fence (actually spelled "fince") what in fact was recreational equipment. Because of such error, the petitioner has argued that this expenditure is not properly before the Court. [10] This argument is without merit. *268 It is clear from the petition that the petitioner understood that its $ 1,215.03 payment to the Pittsburgh Fence Company had been disallowed as a deduction. The petitioner had the opportunity to, and did, present evidence as to this issue at trial; the issue was also argued on brief by both parties. Clearly, the petitioner has not been prejudiced or harmed in any way by the error in the statutory notice. We conclude that the deduction for recreational equipment was properly presented as an issue in this case. Mayerson v. Commissioner,47 T.C. 340, 348-349 (1966); A. Finkenberg's Sons, Inc. v. Commissioner,17 T.C. 973, 980-981 (1951). To reflect concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Reveue Code of 1954 as in effect during the years in issue.↩
2. On Sept. 3, 1971, I.S.C's plan was amended to provide for full vesting in the event of a complete discontinuation of employer contributions, as required by sec. 401(a)(7). The Commissioner has ruled that the failure of an otherwise qualified plan to so provide in its first year will not prevent the plan from qualifying under sec. 401(a), where the necessary provision is added by amendment during the second year of the plan's existence. Rev. Rul. 68-137, 1968-1 C.B. 164↩.
3. I.S.C. used the declining balance method of depreciation for its trucks and crawlers and the double declining balance method for other machinery and equipment, and the Commissioner accepted the use of such methods.↩
4. In 1966, Mr. White owned 50 percent of the common stock of I.S.C. The other 50 percent was owned by George Walters, the corporation's president. As of Sept. 30, 1968, Mr. White had become president of I.S.C. As of Sept. 30, 1970, Mr. White owned 100 percent of the common stock of I.S.C.↩
5. At the trial, the Commissioner conceded that $ 519.66 of such amount was duplicative of item b., leaving $ 518.00 at issue here.↩
6. Sec. 404(a)(3)(A)↩ further limits deductible contributions to 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus plan.
7. Clearly, there was no transfer of title of the trust res to the trustee during the year ending Sept. 30, 1970. However, the Commissioner's position is that if there is a trust, complete in all respects except for delivery of the res to the trustee, the trust will be deemed to be in effect for the taxable year if the res is delivered to the trustee no later than the due date for the filing of the taxpayer's return. Rev. Rul. 69-421, 1969-2 C.B. at 63; Rev. Rul. 57-419, 1957-2 C.B. 264↩.
8. Sec. 404(a)(6)↩, as amended by the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 923, is applicable to all taxpayers, whether they use the cash or accrual method of reporting income.
9. In light of our conclusion that the petitioner failed to substantiate its travel and entertainment expenses as required by sec. 274, we need not pass upon the parties' contentions as to whether such expenses were ordinary and necessary business expenses within the meaning of sec. 162↩.
10. Similar errors were made in the notice of deficiency with respect to the petitioner's deductions for counsel fees, erroneously labeled travel and entertainment expenses, and with respect to the expenditure for house charges at the Pittsburgh Athletic Association, erroneously labeled as having been incurred for "Judo Lessons & Uniform." However, the petitioner has not argued that such expenditures were not properly in issue.↩